941 F.2d 1495
 2 NDLR P 94
 Carmen Jean HARRIS and Leslie John Pettway, Plaintiffs-Appellants,
James Hollifield, et al., Plaintiffs,
v.
Morris THIGPEN, Commissioner of the DOC, Jean W. Hare,
Warden, J.D. White, (Warden-Limestone), Lynn Harrelson,
(Warden-Kilby), Correctional Health Care, Inc., Dr. George
Sutton, Ala. Medical Director (CHC), Brice R. Paul, Sheriff
of Coffee County, Alabama, Coffee County, Alabama and Fred
Payne, Defendants-Appellees,
Georgia Rudolph, et al., Defendants,
Stewart M. Hughey, etc., et al., Defendants-Intervenors,
Alabama Department of Corrections, its agents and employees,
Defendant-Intervenor-Appellee.
Carmen Jean HARRIS and Leslie John Pettway, Plaintiffs-Appellees,
James Hollifield, et al., Plaintiffs,
v.
Morris THIGPEN, Commissioner of DOC, Jean Hare, Warden, J.D.
White, (Warden-Limestone), Lynn Harrelson, (Warden-Kilby),
Correctional Health Care, Inc., Dr. George Sutton, Ala.
Medical Director (CHC), Brice R. Paul, Sheriff of Coffee
County, Alabama, Coffee County, Alabama and Fred Payne,
Defendants-Appellants,
Georgia Rudolph, et al., Defendants,
Stewart M. Hughey, AIS # 131035, Adam Lamar Robinson, Chuck
Stoudemire, AIS # 153319, Alabama Department of
Corrections, its agents and employees,
Defendants-Intervenors-Appellants.
 Nos. 90-7083, 90-7100.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 18, 1991.
 
 Alexa P. Freeman, Elizabeth Alexander, ACLU Nat. Prison Project, Washington D.C., Howard Mandell, Mandell & Boyd, Montgomery, Ala., Nancy Ortega, Stephen B. Bright, Southern Prisoners' Defense Committee, Atlanta, Ga., for plaintiffs-appellants in no. 90-7083.
 Harry A. Lyles, Horace N. Lynn, Andrew Redd, Alice B. Wilhelm, Alabama Dept. of Corrections, Scott R. Talkington, David B. Byrne, Jr., Robinson & Belser, P.A., Jack M. Curtis, Dept. of Public Safety Legal Unit, Montgomery, Ala., Geary A. Gaston, Reams, Vollmer, Philips, Killion, Brooks & Schell, PC, Mobile, Ala., Daryl L. Masters, Webb, Crumpton, McGregor, Davis & Alley, Montgomery, Ala., Dorothy F. Norwood, Correctional Health Care, Inc., Mt. Meigs, Ala., for defendants-appellees in no. 90-7083.
 Neil King, Wilmer, Cutley & Pickering, Washington, D.C., for amicus, Aids Action Counsel.
 Harry A. Lyles, Horace N. Lynn, Andrew W. Redd, Alice Ann Boswell, Alabama Dept. of Corrections, David B. Byrne, Jr., Robison & Belser, P.A., Scott R. Talkington, Montgomery, Ala., for defendants-appellants in No. 90-7100.
 Alexa P. Freeman, ACLU Nat. Prison Project, Elizabeth Alexander, Alvin J. Bronstein, Washington, D.C., Nancy Ortega, Steve Bright, Southern Prisoners' Defense Committee, Atlanta, Ga., Dorothy F. Norwood, Kilby Correctional Facility, Mt. Meigs, Ala., Geary A. Gaston, Reams, Vollmer, Philips, Killion, Brooks & Schell, PC, Mobile, Ala., Howard A. Mandell, Mandell & Boyd, Montgomery, Ala., for plaintiff-appellees in No. 90-7083.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before FAY and BIRCH, Circuit Judges, and HOFFMAN*, Senior District Judge.
 FAY, Circuit Judge:
 
 
 1
 Plaintiffs-appellants appeal the post-trial dismissal of their class action civil rights challenge to various policies and procedures of defendant-appellee, the Alabama Department of Corrections ("DOC"). The appellants raise four issues involving the DOC's policy of uniformly segregating from the general prison population those prisoners who test positive for exposure to Human Immunodeficiency Virus ("HIV"), the virus commonly believed to be the cause of Acquired Immune Deficiency Syndrome ("AIDS").
 
 
 2
 For the following reasons, we AFFIRM the district court's conclusions as to appellants' eighth amendment claim of "deliberately indifferent" medical care by the DOC, as well as to the alleged violation by the DOC of appellants' fourteenth amendment privacy rights. We believe, however, that more complete findings of fact and conclusions of law are necessary for a proper resolution of appellants' Rehabilitation Act and access to courts claims. We therefore VACATE and REMAND those issues to the district court for further proceedings consistent with this opinion.FACTUAL AND PROCEDURAL BACKGROUND.
 
 
 3
 This case involves a range of difficult AIDS-related issues that confront all correctional officials, administrators, policymakers and inmates as they attempt to grapple with the problems engendered by the presence of HIV infection in our nation's prisons and jails.[1]
 
 
 4
 The genesis of the litigation underlying this appeal was the Alabama Legislature's passage in 1987 of a statute that provides, among other things, that all persons sentenced to confinement in an Alabama state correctional facility must be tested for various sexually transmitted diseases designated by the state board of health.[2] Shortly thereafter, defendant-appellee DOC instituted a procedure for implementing this statute. Consequently, all inmates entering an Alabama state correctional facility are tested for sexually transmitted diseases at the time of their admission to the facility in question, and are tested again within thirty days of their release from the prison system.
 
 
 5
 One of the sexually transmitted diseases for which the DOC is required to test is HIV, virtually certain to be the causative agent of AIDS. The DOC initially administers to each prisoner an enzyme-linked immunosorbant assay ("ELISA"), a standard screening test designed to detect the presence of HIV antibodies. If an inmate exhibits a negative ELISA, and if other tests for sexually transmitted diseases prove negative as well, then the inmate is immediately released into the general prison population.
 
 
 6
 If, however, an inmate exhibits a positive ELISA, he or she is then administered a second ELISA to again test for the presence of the HIV antibody. If the second ELISA is also positive, the inmate is administered a third, confirmatory test known as the "Western Blot"; like the ELISA, this test is also aimed at detecting the presence of the HIV antibody.[3]
 
 
 7
 If a particular inmate tests positive for the separate ELISA tests and the confirmatory Western Blot test, the inmate is assigned to one of two segregated HIV wards established by the DOC. Male seropositive[4] inmates are assigned to Dormitory 7 at the Limestone Correctional Facility ("Limestone") in Capshaw, Alabama.[5] Female seropositive inmates are housed in a separate HIV unit at Julia Tutwiler Prison for Women ("Tutwiler") in Wetumpka, Alabama.
 
 
 8
 On November 17, 1987, Carmen Harris, an inmate at Tutwiler, filed a complaint challenging the DOC's actions in testing her for HIV antibodies, and in segregating her in a separate unit when her test results were reported as positive. On March 4, 1988, Ms. Harris and other prisoners filed a motion for class certification. Thereafter, inmates Stewart Hughey and Adam Robinson, two non-HIV general population inmates incarcerated at Limestone, filed a motion to intervene as defendants under Fed.R.Civ.P. 24. The trial court subsequently consolidated the case with a number of similar actions pending in various federal courts in Alabama requesting similar injunctive relief, and certified two classes: the plaintiff class, consisting of all inmates or future inmates of the DOC, except those inmates who had indicated an intention to intervene on behalf of the defendants; another class consisting of intervenor-inmates opposing the relief sought by the plaintiffs.
 
 
 9
 As the trial court observed, plaintiffs' suit essentially challenged the mandatory testing of all present or future Alabama state prisoners for HIV antibodies, as well as the policy of forced segregation and other practices associated with the Alabama system's care for and treatment of seropositive inmates.[6] Plaintiffs claimed that such practices violated their rights guaranteed under the first, fourth, eighth, and fourteenth amendments to the United States Constitution, as well as section 504 of the Rehabilitation Act of 1973 (codified as amended at 29 U.S.C. § 701 (1988)).
 
 
 10
 The first phase of the case was tried from March 27 to March 30, 1989, in Decatur, Alabama.[7] The second phase of the trial took place from June 12 to June 26, 1989, in Montgomery, Alabama. On January 8, 1990, the district court issued an opinion rejecting the claims of the plaintiff class. In denying injunctive relief, the court concluded:
 
 
 11
 CONCLUSION. This Court is of the opinion that the testing program does not amount to an unreasonable search and seizure or an invasion of a constitutionally protected privacy; that Plaintiffs have shown no credible evidence of failure to provide adequate care for serious medical, dental and mental health needs amounting to cruel and unusual punishment in violation of the Eighth Amendment; that the totality of other conditions to which seropositive prisoners are subjected does not inflict cruel and unusual punishment; that the submission of Defendant inmates to close contact with known AIDS carriers could well be considered as invasive of constitutional rights of the Defendant prisoners; that the differential treatment of seropositive prisoners does not violate equal protection of the laws in violation of the Fourteenth Amendment; that the segregation of such prisoners classified as shown by the evidence does not offend constitutional rights even when done without a hearing; that the public disclosure of positive tests is not a violation of [the] right of privacy of the positive inmates; that the recent policy with respect to library hours does not constitute a denial of meaningful access to prison legal materials nor does it deny them their right of access to courts in violation of the First or Fourteenth Amendment; and that conditions and practices to which seropositive prisoners are subjected does not constitute a discrimination against them as handicapped individuals in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, et seq., because the preponderance of the evidence does not show them to have been otherwise qualified for the privileges claimed by them.
 
 
 12
 Harris v. Thigpen, 727 F.Supp. 1564, 1583 (M.D.Ala.1990).
 
 
 13
 On appeal, plaintiffs-appellants challenge the district court's factual findings and legal conclusions on four grounds: 1) whether the Alabama DOC, in violation of the eighth amendment, is deliberately indifferent to seropositive inmates' serious medical and psychiatric needs; 2) whether the involuntary disclosure of prisoners' HIV status violates their fourteenth amendment right to privacy; 3) whether the blanket exclusion of HIV-positive inmates from general prison population housing, educational, employment, community placement, and other programs violates section 504 of the Rehabilitation Act; 4) whether the DOC has violated seropositive inmates' constitutionally guaranteed right of access to courts. In addition, the DOC has cross-appealed the trial court's exclusion in limine of certain survey evidence that appellees had planned to introduce at trial, known as the "Ingram Study."
 
 
 14
 More specific factual material relating to each of appellants' claims of error is presented in the course of the Discussion below. Preliminarily, however, we frame our examination of the factual and legal issues with some very rudimentary background on AIDS and HIV infection. Such background is necessary to a meaningful review of the constitutional and statutory violations that appellants allege are present in the Alabama correctional system's attempts to treat and control the spread of the dread disease.
 
 
 15
 Epidemiology, Transmission, and Treatment of AIDS and HIV Infection.
 
 
 16
 AIDS is a devastating, communicable, fatal disease that attacks and destroys the body's immune system. It renders individuals "susceptible to a range of 'opportunistic' infections, malignancies, and other diseases which would not generally be life-threatening to persons with normally functioning immune systems. AIDS also directly causes dementia and other disorders of the central nervous system." Correctional Facilities, supra note 3, at 3. The term "AIDS," however, is considered obsolete in the sense that it describes only a later, end-stage of an epidemic[8] disease more appropriately labeled "HIV infection." Update 1988, supra note 1, at 4.[9] Scientists now conceptualize HIV infection generally as a continuum of disease ranging from asymptomatic infection to end-stage AIDS. Id. at 5.[10] It is thought that virtually everyone infected with HIV will progress at some point[11] to active disease; further, the prognosis for advanced stage HIV-infected patients is very poor. See id. Although periods of survival vary considerably, no one has ever recovered from the disease, and there is as yet no effective vaccine or cure. Correctional Facilities, supra note 3, at 3.
 
 
 17
 AIDS does not appear to be an air-borne disease. While it is not without question, the modes of transmission of HIV infection seem to be relatively clear and well-documented, and have been so since quite early in the HIV epidemic. Id. at 8. Epidemiologic evidence continues to indicate that the virus is transmitted in three ways: 1) through sexual intercourse[12]; 2) through blood-to-blood (or blood-to-mucous membrane) exposure[13]; and 3) through perinatal events.[14] In a small percentage of cases, there is no explanation for how the disease is transmitted. However, despite common misapprehensions, virtually no evidence exists that HIV is spread through casual (even intimate) non-sexual contact; animals; blood donation; food; inanimate objects, e.g. toilet seats, drinking fountains or eating utensils; insects; skin; vaccines; or water. Casual Contact, supra note 10, at 4-7; see 1989 Update, supra note 10, at 5; Update 1988, supra note 1, at 12; Correctional Facilities, supra note 3, at 15-17; see also Lifson, Do Alternate Modes for Transmission of Human Immunodeficiency Virus Exist?: A Review, J.A.M.A., 259:1353 (Mar. 4, 1988).
 
 
 18
 Although there have been significant gains in understanding the structure and behavior of HIV, the goal of developing an effective AIDS vaccine available for widespread human use is perhaps a decade away.[15] Further, as mentioned, there is as yet no cure for HIV infection. Progress has been made, however, in developing therapeutic drugs aimed at preventing or controlling diseases associated with HIV infection. Of these, the only anti-HIV drug that has been granted full Federal Drug Administration ("FDA") approval is AZT (also known as zidovudine, azidothymidine, and Retrovir), which was approved in March, 1987. AZT has been shown to be fairly effective in treating patients with advanced stages of HIV infection; FDA approval is limited to seriously symptomatic patients. 1989 Update, supra note 10, at 3.
 
 
 19
 DISCUSSION.
 
 
 20
 Medical Care.
 
 
 21
 Appellants first contend that the Alabama DOC is deliberately indifferent to the serious medical needs of seropositive inmates incarcerated at Limestone and Tutwiler. In considering this claim, the district court found "that the preponderance of the evidence shows no violation of any prisoner's rights to medical or psychological or psychiatric care and no deliberate indifference to any serious medical or psychological need." Harris, 727 F.Supp. at 1576 (footnote omitted). We agree.[16]
 
 
 22
 The Supreme Court has recognized that correctional inmates "must rely on prison authorities to treat [their] medical needs; if the authorities fail to do so, those needs will not be met." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Federal and state governments therefore have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration. See id. at 104, 97 S.Ct. at 291; see also Wellman v. Faulkner, 715 F.2d 269, 271 (7th Cir.1983) ("When a state imposes imprisonment as a punishment for crime, it accepts the obligation to provide persons in its custody with a medical care system that meets minimal standards of adequacy."), cert. denied, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984). Prison personnel may not subject inmates to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106, 97 S.Ct. at 292; Mandel v. Doe, 888 F.2d 783, 787 (11th Cir.1989). The Supreme Court has declared that such "deliberate indifference" by a correctional system to the serious medical needs of its prisoners constitutes the kind of " 'unnecessary and wanton infliction of pain' "[17] that is proscribed by the eighth amendment.[18] Estelle, 429 U.S. at 104, 97 S.Ct. at 291 (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). Further, this court has acknowledged that the deliberate indifference standard also applies to inmates' psychiatric or mental health needs. Greason v. Kemp, 891 F.2d 829, 834 (11th Cir.1990); Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir.1989) (citing Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir.1986)). It is thus clear that prisoners are guaranteed the right under the eighth amendment to be free from deliberate indifference by correctional institutions to their serious physical or psychological needs.[19]
 
 
 23
 In articulating the scope of inmates' right to be free from deliberate indifference, however, the Supreme Court has also emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle, 429 U.S. at 105, 97 S.Ct. at 291; Mandel, 888 F.2d at 787. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Rogers, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. See Estelle, 429 U.S. at 106, 97 S.Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); Mandel, 888 F.2d at 787-88 (mere negligence or medical malpractice "not sufficient" to constitute deliberate indifference); Waldrop, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. See Waldrop, 871 F.2d at 1033 (citing Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir.1977)).
 
 
 24
 In institutional level challenges to prison health care such as this one, systemic deficiencies can provide the basis for a finding of deliberate indifference. Rogers, 792 F.2d at 1058. Deliberate indifference to inmates' health needs may be shown, for example, by proving that there are "such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Moreover, although incidents of malpractice standing alone will not support a claim of eighth amendment violation, "[a] series of incidents closely related in time may disclose a pattern of conduct amounting to deliberate indifference." Rogers, 792 F.2d at 1058-59 (citing Bishop v. Stoneman, 508 F.2d 1224 (2d Cir.1974)). "Repeated examples of delayed or denied medical care may indicate a deliberate indifference by prison authorities to the suffering that results." Id. at 1059 (citing Todaro v. Ward, 565 F.2d 48, 52 (2d Cir.1977)); see also Ramos, 639 F.2d at 575 ("In class actions challenging the entire system of health care, deliberate indifference to inmates' health needs may be shown by proving repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff.").
 
 
 25
 In the instant case, plaintiffs sought to establish the Alabama DOC's alleged "deliberate indifference" to prisoners' serious medical needs in a number of ways.
 
 
 26
 First, plaintiffs had medical experts testify regarding their review of case histories and medical records of the treatment received by various prisoners in the Alabama correctional system afflicted with active, advanced-stage HIV infection. These inmates were for the most part stricken with various opportunistic diseases and conditions that commonly attack patients whose immune systems have been ravaged by AIDS. Upon careful review of the testimony presented in the record regarding each case (some of which are summarized by the parties in their briefs), we believe that such evidence may or may not establish inadequate treatment by the DOC health care provider for some or all of the prisoners whose histories were considered. However, taken individually or together, the cases at most evidence isolated incidences of medical malpractice. We simply cannot agree with the plaintiffs that the treatment received by the inmates in question was so inadequate as to manifest the kind of "conscious or callous indifference" necessary to raise the DOC's perhaps negligent care of certain AIDS-infected prisoners to violations of a constitutional magnitude.
 
 
 27
 We mention the case of inmate C.D. by way of example. Plaintiff's expert, Dr. Robert Cohen, testified concerning C.D.'s medical condition. Dr. Cohen stated that on October 12, 1988, C.D. began complaining of severe pain in his ears, wanted to see a doctor, and after having seizures was transferred to Cooper-Green Hospital in Birmingham, Alabama. While still at Limestone, C.D. had been administered an anti-seizure medication, as well as separate medications to treat fungal infection, bacterial infection, and certain viral infections. At Cooper-Green Hospital, after receiving a CAT-scan, C.D. was diagnosed as having probable toxoplasmosis, a common infection in persons with HIV disease that usually involves the development of a brain abscess. He was then prescribed sulfadiazene and pyrimethamine, antibiotics particularly useful against the toxoplasmosis organism, as well as anti-seizure medication and additional drugs to treat thrush fungal infection of the mouth.
 
 
 28
 Dr. Cohen testified that when he saw C.D. at Limestone three or four days after the inmate's hospital visit, C.D. had not yet received sulfadiazene or pyrimethamine, two of the drugs prescribed for and administered to him earlier at Cooper-Green. Dr. Cohen conceded, however, that the nursing staff was aware of C.D.'s need, was attempting to acquire the medications, and that C.D. did eventually receive them. C.D. developed a skin rash in reaction to the sulfadiazine, and this medication was discontinued--a decision Dr. Cohen "had no disagreement with," although he felt that another drug should have been substituted for treatment of C.D.'s toxoplasmosis brain abscess. (R15-[trans. vol. 5]-26). Presumably because of the treatment that he had received, C.D. survived this episode of toxoplasmosis.
 
 
 29
 Dr. George Sutton, Medical Director for CHC, testified that he had been actively involved in the treatment of C.D. since the time that CHC had begun running the DOC's health care facilities in November, 1988. C.D. was hospitalized in late 1989 for what was presumed to be PCP, another serious infection common to advanced stage HIV victims. He was given the antibiotic pentamidine, which treatment was continued when C.D. was transferred from Cooper-Green back to CHC's care. C.D. apparently did very well clinically, except for severe skin loss due to his allergy to sulfa drugs. C.D. was administered AZT, and his T-4 blood cell count was periodically monitored. However, as a result of bone marrow suppression and dropping blood counts associated with the administration of AZT, CHC had to discontinue giving AZT to C.D.
 
 
 30
 In addition to AZT-related medical management problems with C.D., there were patient-compliance problems on the part of the inmate. For example, C.D. initially objected to weekly blood counts that were necessary to monitor his level of bone marrow suppression and blood count. Moreover, C.D. declined to take his AZT. Dr. Sutton testified that he "begged" C.D. to resume the blood counts and take the medication, emphasizing the importance of these measures. C.D. agreed, but three weeks later again refused AZT and the blood counts. Dr. Sutton made a special trip to Limestone, had the inmate brought to the medical facility, and after a long period of persuasion, convinced C.D. to come back to the medical unit to resume AZT treatment.
 
 
 31
 Even upon resumption of AZT, however, C.D.'s response was not favorable, and his condition progressively worsened. Four days before trial, CHC performed a CAT brain scan and a lumbar puncture on C.D. It was determined that C.D. had another brain abscess. Dr. Sutton, consulting with the primary care physician at Limestone, had C.D. transferred to the internal medicine service at Cooper-Green hospital. C.D. died on June 21, 1989.
 
 
 32
 Plaintiffs presented much additional testimony from Dr. Cohen and another expert, Dr. Frank Rundle, which criticized C.D.'s course of treatment. The testimony second-guessed at many points the decisions of the doctors entrusted with the care of C.D., and the experts cited numerous incidents of allegedly negligent or inadequate treatment of C.D.'s various opportunistic infections and conditions. Such criticism may or may not be justified. But again, whether C.D.'s treatment might have constituted malpractice is not the focus of our inquiry here. Measured against constitutional minima, the record regarding C.D. seems to evidence at least tolerable and responsive medical treatment--transfers to better, outside hospital facilities on several occasions; CAT-scans; the administration of a wide variety of antibiotics and medications, including AZT; blood monitoring; blood chemistry workups; active monitoring and treatment for diabetes. In short, whatever C.D.'s course of treatment indicates, it is not deliberate indifference. See Bass v. Sullivan, 550 F.2d 229, 232 (5th Cir.),[20] cert. denied, 434 U.S. 864, 98 S.Ct. 195, 54 L.Ed.2d 138 (1977); see also Waldrop, 871 F.2d at 1035 (observing that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation"); Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir.1985) (evidence showed that plaintiff received "significant" medical care while in jail, and although plaintiff may have desired different modes of treatment, care provided by jail did not constitute deliberate indifference), cert. denied, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986); Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (6th Cir.1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").
 
 
 33
 Plaintiffs-appellants further allege that the DOC has been deliberately indifferent to inmates' serious medical needs because physician staffing is numerically inadequate for the HIV units. Appellants also argue that the physicians assigned to Limestone and Tutwiler were "simply incompetent" to treat AIDS and other serious HIV diseases, based upon their lack of knowledge of diagnosis, prophylaxis, monitoring and treatment of the disease.
 
 
 34
 After reviewing the testimony in the record regarding staffing, particularly that of Dr. Sutton, we find that there is enough evidence to support the district court's conclusion of no deliberate indifference; we agree with the court that the units were not so understaffed as to manifest systemic deliberate indifference to the seropositive inmates' needs.[21] With regard to the expertise of correctional system medical staff, the district court reasoned:
 
 
 35
 Here we have a new disease (the first case in the Alabama penal system was seen in 1987) for which treatments were largely unknown, untried and unapproved until recently. Evidence of early lack of treatment of those early AIDS patients in the penal system is not seriously inconsistent with what was done in the best of hospitals when treatments were unknown and fear of the disease was rampant. Obviously, specialists in the treatment of AIDS were until recently very difficult to find, and doctors who became experienced in that unknown and fear-controlled field were driven, either by an extreme devotion to duty, or by a necessity to practice their chosen profession when there was little room for them in more desirable and rewarding fields of medicine. It is reasonable to believe that the better doctors more often than not hoped to evade expertise in treating AIDS patients and that, even now, it is difficult in a poor State such as Alabama to obtain experts in treating AIDS and its opportunistic diseases who are willing to accept full-time employment in a penal institution. It is, therefore, understandable how and why the standards for treating AIDS patients in the Alabama penal institutions (where less than ten women and less than 150 men have been found to have been infected) are less stringent than those in such large States as New York and California where there are several thousand AIDS patients in penal institutions and experts in the disease may concentrate on their chosen field of medicine. The evidence of medical or dental neglect shown in this case by reputable evidence do[es] not amount to a "deliberate indifference to serious medical needs".
 
 
 36
 Harris, 727 F.Supp. at 1576-77. In considering the record on this point, we agree with appellants that the lack of knowledge of certain primary care physicians at Limestone and Tutwiler relating to some seemingly basic terminology about the diagnosis, prophylaxis, monitoring, and treatment of HIV infection is disturbing. And, although the district court's observations about the Alabama system above may very well be accurate, they would not serve to justify deliberate indifference to Alabama seropositive inmates' serious medical needs if such were the case. See Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.1989) (observing that " 'access to medical staff is meaningless unless that staff is competent and can render competent care' " (citations omitted)). The record fully supports the trial court's conclusion that the DOC has not been "deliberately indifferent" to the seropositive prisoners' serious medical needs.[22]
 
 
 37
 We would also note here that in spite of our agreement with the district court's ultimate conclusion on this point, we are troubled by and reject any suggestion in the court's reasoning that a state's comparative wealth might affect an HIV-infected prisoner's right to constitutionally adequate medical care. We do not agree that "financial considerations must be considered in determining the reasonableness" of inmates' medical care to the extent that such a rationale could ever be used by so-called "poor states" to deny a prisoner the minimally adequate care to which he or she is entitled. See Harris, 727 F.Supp. at 1577-78. Minimally adequate care usually requires minimally competent physicians. It may also sometimes require access to expensive equipment, e.g. CAT scanners or dialysis machines, or the administration of expensive medicines. Once again, although we are reluctant to interfere in a state system's course of treatment of its inmates, we will not ignore the presence of an eighth amendment violation. Such a violation could well be present if the care received by the prisoners, when measured against general professional standards, rose to such a level of gross incompetence that it manifested deliberate indifference. See Waldrop, 871 F.2d at 1035; see also Rogers, 792 F.2d at 1058 (grossly incompetent medical care or choice of easier but less efficacious course of treatment can constitute deliberate indifference); Murrell v. Bennett, 615 F.2d 306, 310 n. 4 (5th Cir.1980) (treatment may violate eighth amendment if it involves "something more than a medical judgment call, an accident, or an inadvertent failure"). We are aware that systemic deficiencies in medical care may be related to a lack of funds allocated to prisons by the state legislature. Such a lack, however, will not excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment. See Wellman v. Faulkner, 715 F.2d at 274; see also Ancata v. Prison Health Servs. Inc., 769 F.2d 700, 705 (11th Cir.1985) (lack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment for inmates); Newman v. Alabama, 559 F.2d 283, 286 (5th Cir.1977) ("It should not need repeating that compliance with constitutional standards may not be frustrated by legislative inaction or failure to provide necessary funds.") (citing Gates v. Collier, 501 F.2d 1291, 1319 (5th Cir.1974)), rev'd in part sub nom. Alabama v. Pugh 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114, cert. denied, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).
 
 
 38
 Finally, plaintiffs argue that the mental health care provided to prisoners in the HIV units at Limestone and Tutwiler was grossly inadequate in terms of staffing, as well as in its failure to include adequate AIDS education and counseling. As mentioned, this circuit has recognized that a failure of a correctional system to provide basic psychiatric and mental health care can constitute a claim of deliberate indifference to the serious medical needs of inmates. See Greason, 891 F.2d at 834; Rogers, 792 F.2d at 1058. "[A] trier of fact can conclude that one who provides grossly inadequate psychiatric care to a prison inmate is deliberately indifferent to the inmate's needs." Greason, 891 F.2d at 835 (citing Waldrop, 871 F.2d at 1033).
 
 
 39
 Nevertheless, we have once again considered carefully the record on this issue. In spite of the testimony offered by plaintiffs' medical experts critical of the amount and quality of psychiatric coverage offered to the general prison population, and particularly to the seropositive prisoners, we refuse to gainsay the district court's conclusion.
 
 
 40
 DOC psychologist[23] Gina Hendricks-Ortiz testified that she was the psychologist responsible for the approximately three hundred inmates assigned to the HIV unit and other segregation units at Limestone. She apparently provided various types of counseling for the seropositive inmates, including grief counseling, crisis intervention counseling, counseling for depression and stress, and other appropriate counseling. She also conducted mental health and AIDS education workshops for the HIV-positive inmates, including group-type sessions in the HIV dormitories. Ms. Hendricks-Ortiz testified that she was able to provide counseling to all seropositive inmates who had requested it, although very few of the HIV-positive inmates had actually done so. In addition to her services, Ms. Hendricks-Ortiz testified that the Limestone facility was served by another full-time employee with her same job title ("Psychological Associate II"), two Ph.D. psychologists, and two psychiatrists (one newly hired).
 
 
 41
 Like the district court that considered this testimony, we are satisfied that the Alabama DOC has not responded with deliberate indifference to seropositive prisoners' psychological needs. In so concluding, we acknowledge the likelihood that Limestone, for example, is not ideally staffed and the quality of its mental health care perhaps is substandard. Plaintiffs' expert Dr. Frank Rundle testified during the following colloquy:
 
 
 42
 Q: Did you reach any overall conclusions about the quality of mental health services offered to the HIV prisoners at Limestone?
 
 
 43
 A: Yes, I have. I think it was ... is a poor quality. Not only because there is insufficient staff, but the staff that is available just isn't, I think, dealing with the special needs of that population. It is mostly a perfunctory kind of contact.
 
 
 44
 The psychiatrist, as far as I could tell, focused primarily upon the use of medication. The psychologist, I think, was doing mostly, again, routine workshops without much individual interchange with inmates.
 
 
 45
 Q: Were these special needs serious medical needs?
 
 
 46
 A: I think they were serious. Yes.
 
 
 47
 (R17-[trans. vol. 7]-131-32). Yet, even accepting the doctor's conclusions here does not mandate a legal conclusion that the mental health care provided to seropositive prisoners by the Alabama system is constitutionally inadequate--the limit of our inquiry on this point. Unfortunately, as with all medical care provided to prisoners, it is not constitutionally required that mental health care be "perfect, the best obtainable, or even very good." Brown v. Beck, 481 F.Supp. 723, 726 (S.D.Ga.1980).
 
 
 48
 Moreover, while the desirability and wisdom of providing AIDS education and counseling to seropositive prisoners, and indeed to the general prison population, is undeniable, we are frankly uncomfortable measuring with a constitutional yardstick the attempts of a correctional institution to achieve these ends. A correctional system's refusal to respond medically to specific psychiatric disorders and conditions that accompany the presence of HIV infection, such as AIDS-related dementia, could constitute grounds for alleging an eighth amendment violation. But much of the inadequacy in dealing with seropositive inmates' mental health needs alleged by appellants seems to be focused also on the DOC's deficient efforts to provide ongoing education and counseling to help HIV-positive inmates deal with issues of impending death, depression, despair, and stigmatization; that is, plaintiffs have also attacked as "cruel and unusual" the system's failure to provide the resources and preventive therapy necessary to retard the general psychological deterioration of inmates afflicted with a vicious, always fatal disease.
 
 
 49
 This is not a frivolous claim, nor is it an unsympathetic one. It does strike us, however, as more akin qualitatively to the types of systemic inadequacies that federal courts have been ill-suited and justifiably reluctant to entertain as evils of constitutional consequence. In Newman v. Alabama, 559 F.2d 283 (5th Cir.1977), for example, we specifically considered the issue of whether psychiatric deterioration brought on by conditions of indefinite, segregated confinement could constitute cruel and unusual treatment violative of the eighth amendment:
 
 
 50
 The mental, physical, and emotional status of individuals, whether in or out of custody, do deteriorate and there is no power on earth to prevent it.... We decline to enter this uncharted bog. If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety, so as to avoid the imposition of cruel and unusual punishment, that ends its obligations under Amendment Eight. The Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration.
 
 
 51
 Id. at 291. The instant case is distinguishable from Newman. The disease counseling and education measures that appellants want improved or implemented by the DOC are more than mere "amenities." Indeed, they are part of what appellants argue is "reasonably adequate" medical/psychiatric treatment for prisoners stricken with HIV disease. Nevertheless, helping a terminally sick prisoner "cope" psychologically with various aspects of a dread physical illness, while therapeutic, may be a more expansive view of mental health care than that contemplated by the eighth amendment.[24] As the First Circuit opined in a case similar to Newman, "[s]uch a view, however civilized, would go measurably beyond what today would generally be deemed 'cruel and unusual.' " Jackson v. Meachum, 699 F.2d 578, 583 (1st Cir.1983). The record in this case demonstrates that the Alabama DOC has not been deliberately indifferent to HIV-infected prisoners' psychological needs, and has comported with constitutional minima. The district court did not err in making this conclusion.
 
 
 52
 In sum, although the eighth amendment guarantees the seropositive inmates' right to adequate medical or psychological care, we are not convinced that the Alabama DOC, with its shortcomings, has been "deliberately indifferent" to the HIV-afflicted prisoners' serious medical or psychiatric needs.
 
 
 53
 Right to Privacy.
 
 
 54
 Plaintiffs-appellants next charge that the DOC's policies of mandatory testing and segregation, as well as certain DOC disclosure practices, violate the seropositive prisoners' constitutional rights of privacy.
 
 
 55
 The core of appellant's privacy attack is devoted to the DOC's blanket policy of isolating from the general prison population those inmates who have tested positive for HIV. Appellants argue that the involuntary disclosure of inmates' seropositive status resulting from such segregation is unnecessary, gravely stigmatizing, and ultimately violative of constitutionally-guaranteed privacy rights. See Brief of Appellants-Cross Appellees at 35-41.[25] After careful consideration of this claim, we disagree.
 
 
 56
 First, as a matter of general principle, the Supreme Court has "held that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Prison walls do not separate inmates from their constitutional rights. Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Hence, when prison regulations or practices offend fundamental constitutional guarantees, "federal courts will discharge their duty to protect constitutional rights." Procunier v. Martinez, 416 U.S. 396, 405-06, 94 S.Ct. 1800, 1807-08, 40 L.Ed.2d 224 (1974), modified, Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); see also Sheley v. Dugger, 833 F.2d 1420, 1423 (11th Cir.1987) (traditional deference to prison authorities does not mean "that courts must abstain from reviewing the constitutional claims of prisoners"). It is also axiomatic, however, that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). A prisoner's constitutional "rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration," Thornburgh v. Abbott, 490 U.S. 401, 407, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989) (quoting Turner, 482 U.S. at 85, 107 S.Ct. at 2259), and a prisoner retains only those rights that are "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrective system." Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).
 
 
 57
 With regard to the right asserted on this appeal, it is clear that prison inmates, in spite of their incarceration, "retain certain fundamental rights of privacy." Houchins v. KQED, Inc., 438 U.S. 1, 5 n. 2, 98 S.Ct. 2588, 2592 n. 2, 57 L.Ed.2d 553 (1978); see Torres v. Wisconsin Dep't of Health & Social Servs., 838 F.2d 944, 951 (7th Cir.1988) (observing that "inmates do retain some constitutional right to privacy"), cert. denied, 489 U.S. 1017, 109 S.Ct. 1133, 103 L.Ed.2d 194 (1989). The precise nature and scope of the privacy right at issue in this case is rather ill-defined.[26] We nevertheless believe and assume arguendo that seropositive prisoners enjoy some significant constitutionally-protected privacy interest in preventing the non-consensual disclosure of their HIV-positive diagnoses to other inmates, as well as to their families and other outside visitors to the facilities in question. As one district court has elaborated:
 
 
 58
 Each [seropositive prisoner] is fully aware that he is infected with a disease which at the present time has inevitably proven fatal. In the court's view there are few matters of a more personal nature, and there are few decisions over which a person could have a greater desire to exercise control, than the manner in which he reveals that diagnosis to others. An individual's decision to tell family members as well as the general community that he is suffering from an incurable disease, particularly one such as AIDS [or HIV], is clearly an emotional and sensitive one fraught with serious implications for that individual. Certain family members may abandon the [seropositive] victim while others may be emotionally unprepared to handle such news. Within the confines of the prison the infected prisoner is likely to suffer from harassment and psychological pressures. Beyond the prison's walls the person suffering from AIDS [or HIV] is often subject to discrimination.
 
 
 59
 ... It may be even more essential for a prisoner than a person who enjoys the freedoms associated with life outside of prison, and the personal strength derived from those freedoms, that the prisoner be accorded the ability to protect and shape his identity to as great a degree as possible. There is little question but that the prisoner identified as having AIDS will be severely compromised in his ability to maintain whatever dignity and individuality a prison environment allows.
 
 
 60
 ... The threat to family life and the "emotional enrichment [gained] from close ties with others" ... is quite real when an AIDS victim's diagnosis is revealed. Ignorance and prejudice concerning the disease are widespread; the decision of whether, or how, or when to risk familial and communal opprobrium and even ostracism is one of fundamental importance.
 
 
 61
 Doe v. Coughlin, 697 F.Supp. 1234, 1237-38 (N.D.N.Y.1988) (citations and footnote omitted).[27]
 
 
 62
 It is undisputed that the involuntary placement of seropositive prisoners into separate HIV dormitories necessarily involves a measure of non-consensual disclosure of an inmate's seropositive status.[28] Once again, however, prisoners' constitutional rights are necessarily subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); see Wolfish, 441 U.S. at 547, 99 S.Ct. at 1878. Indeed, the Supreme Court has upheld various restrictions on prisoners' rights on the basis of this principle. See, e.g., Turner, 482 U.S. at 91-93, 107 S.Ct. at 2262-2264 (first amendment rights permissibly limited by bar on inmate-to-inmate correspondence, where record clearly demonstrated that the regulation was reasonably related to legitimate security interests); Block v. Rutherford, 468 U.S. 576, 586-89, 104 S.Ct. 3227, 3232-34, 82 L.Ed.2d 438 (1984) (ban on contact visits upheld in deference to administrators' concerns that such visits would jeopardize the security of the facility, and regulation was "reasonably related" to such concerns); Wolfish, 441 U.S. at 556-57, 99 S.Ct. at 1883-84 (room-search rule upheld, since any expectation of privacy retained by pre-trial detainee in his cell under fourth amendment is necessarily diminished in scope in deference to the realities of institutional confinement); Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 132-33, 97 S.Ct. 2532, 2541-42, 53 L.Ed.2d 629 (1977) (security concerns regarding prisoners' efforts to form unions justified limitations on various first amendment rights); Pell, 417 U.S. at 827-28, 94 S.Ct. at 2806-07 (first amendment rights permissibly limited by visitation restriction designed to encourage rehabilitation without compromising institutional security concerns). Further, in general, privacy rights are among those most obviously curtailed by the fact of a prisoner's confinement in a correctional institution. See Wolfish, 441 U.S. at 537, 99 S.Ct. at 1873 (noting that "[l]oss of freedom of choice and privacy are inherent incidents of confinement in" jails, prisons or custodial centers); United States v. Blake, 888 F.2d 795, 800 n. 11 (11th Cir.1989) (acknowledging that in prison settings, privacy rights are viewed as being on "a lesser scale").
 
 
 63
 In this case, we must balance the limited personal privacy interests (assuming such exist) of the seropositive inmates, with those legitimate interests that underlie the DOC's decision to segregate such inmates from the general prison population. In so doing, we are also obliged to consider the interests and concerns of the defendant-intervenors in this case.[29]
 
 
 64
 In Turner v. Safley, the Supreme Court formulated a test sensitive to both the need to protect inmates' constitutional rights and the policy of judicial restraint regarding prisoner complaints. See Turner, 482 U.S. at 85, 107 S.Ct. at 2259.[30] The Court determined that the standard of review for evaluating prisoners' constitutional claims should be one of reasonableness: when a prison regulation or policy "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89, 107 S.Ct. at 2261.[31]
 
 
 65
 In articulating its test, the Court canvassed its earlier "prisoners' rights" cases, and identified several "factors that are relevant to, and that serve to channel, the reasonableness inquiry." Thornburgh v. Abbott, 490 U.S. at 414, 109 S.Ct. at 1882. These are: (a) whether there is a "valid, rational connection" between the regulation and a legitimate government interest put forward to justify it; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (c) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates and the allocation of prison resources generally; and (d) whether the regulation represents an "exaggerated response" to prison concerns. See Turner, 482 U.S. at 89-91, 107 S.Ct. at 2261-2263. We consider these factors in more detail below.
 
 
 66
 1. Rational relationship to legitimate governmental objective
 
 
 67
 First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89, 107 S.Ct. at 2262 (quoting Block v. Rutherford, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)). At trial, the DOC justified its segregation policy on the asserted goals of reducing the transmission of HIV infection and of reducing the level of violence within the Alabama prison system. The legitimacy of these purposes seems beyond dispute; rather, the issue is whether Alabama's blanket HIV segregation policy is rationally related to such purposes. Appellants contend that "there is no rational relationship between violating the privacy of prisoners who test positive for HIV [by separating them from the general prison population] and any legitimate penological purpose." Brief of Appellants-Cross-Appellees at 37. We disagree.
 
 
 68
 The logical connection between the stated goals of reducing HIV transmission and promoting internal prison security, and the DOC's policy of uniformly segregating seropositive prisoners, might be questioned. Indeed, it has been the crux of a massive, intense correctional policy debate surrounding the proper methods of testing for and preventing the transmission of HIV infection within prison systems. In April, 1988, the National Institute of Justice observed:
 
 
 69
 [T]here is serious controversy about the effectiveness of screening in reducing transmission of HIV. But without segregation or separation of seropositives, screening can have little or no effect on transmission. Therefore, correctional systems should probably think in terms of deciding between two basic constellations of policies:
 
 
 70
 1. mass screening, segregation of seropositives who pose behavioral risks, notification to correctional staff, and education on AIDS; or
 
 
 71
 2. focusing prevention efforts on mandatory AIDS education and intensive efforts to identify and control predatory inmates and those engaging in high-risk behavior (without mass HIV screening), together with strict confidentiality of medical information.
 
 
 72
 Expected seropositive rates and the availability of various types of housing (e.g., single- v. double-cells) will play an important role in these interrelated policy decisions. Ultimately, however, these large policy decisions must be grounded in careful consideration of the advantages and disadvantages of the major options.
 
 
 73
 Correctional Facilities, supra note 3, at 37-38. The DOC's correctional approach to handling the problem of HIV transmission obviously has been structured according to the first "constellation" of policies mentioned above.[32] Appellants, on the other hand, have offered evidence roundly critical of such a penological approach, urging that the needs of seropositive prisoners are best served by a correctional policy developed along the lines of the second model, i.e., by integrating HIV-positive prisoners into the general prison population, and by implementing an "appropriate AIDS education and counseling program, along with appropriate security measures and classification of prisoners." Brief of Appellants-Cross-Appellees at 38.
 
 
 74
 We express no opinion on either side of this debate. One can argue, as appellants do, that the current trend in correctional thinking has moved increasingly away from blanket segregation policies and towards policies of "mainstreaming"--that is, maintaining all categories of HIV-infected prisoners in the general prison population. 1989 Update, supra note 10, at 53. After reviewing the record, however, it also seems clear to us that debate on this issue is far from settled, and undoubtedly will continue as the rapidly expanding corpus of information about HIV engenders new strategies for dealing with the disease in the difficult prison setting. Even if Alabama's approach in this case is now a minority position among state correctional systems, we simply are unable to say at this point that the DOC's use of combined mass screening and segregation is so remotely connected to the legitimate goals of reducing HIV transmission and violence within the state's penal system "as to render the policy arbitrary or irrational." Turner, 482 U.S. at 89-90, 107 S.Ct. at 2261-2262.
 
 
 75
 2. Availability of alternative means to exercise right
 
 
 76
 The second factor identified in Turner as relevant to the determination of a prison restriction's reasonableness is "whether there are alternative means of exercising the right that remain open to prison inmates." Turner, 482 U.S. at 90, 107 S.Ct. at 2262. If so, courts in gauging the validity of a regulation should be particularly conscious of the " 'measure of judicial deference owed to corrections officials.' " Id. (quoting Pell v. Procunier, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)). In considering this factor, the right at issue must be viewed "sensibly and expansively." Thornburgh, 490 U.S. at 417, 109 S.Ct. at 1883. Thus, the Court in Turner did not require that prisoners be provided with alternative means of communicating with inmates at other institutions; the Court instead held it sufficient that "other means of expression (not necessarily other means of communicating with inmates in other prisons) remained available." Id. at 417-18, 109 S.Ct. at 1883-84.
 
 
 77
 Applying this second Turner factor to the facts of the instant case, however, is problematic because the limited right that appellants claim is being violated by the DOC does not lend itself to an "expansive" reading. Unlike the first amendment activity at issue in Turner, any privacy right claimed here by the seropositive inmates in their medical status is a "passive" one. It is difficult to talk of "alternative means" of protecting such a right, since, unlike the first amendment context, there is no range or continuum of other affirmative activity against which to measure the encroachment of a given prison restriction. Just as one cannot be "a little bit pregnant," disclosure of one's HIV status either occurs or it does not. Thus, in our case, this particular factor of the Turner calculus does little to channel our inquiry into the reasonableness of the segregation policy as a restriction on seropositive inmates' right to privacy in disclosing their medical diagnoses. Because of the "all or nothing" nature of the right at issue, the lack of alternative means to honor it merely reaffirms a fact upon which the parties have apparently already agreed, i.e., that involuntary disclosure of prisoners' HIV status is an inherent byproduct of Alabama's "identify and isolate" policy.
 
 
 78
 3. "Ripple effects" of accommodating the right
 
 
 79
 The third factor to be addressed under the Turner analysis is "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." Thornburgh, 490 U.S. at 418, 109 S.Ct. at 1884. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Turner, 482 U.S. at 90, 107 S.Ct. at 2262 (citation omitted).
 
 
 80
 Evidence at trial suggested that the consequences or "ripple effects" of integrating seropositive prisoners into the general prison population could be severe indeed for prisoners and prison staff. First, as observed by the district court, the presence of an intervening defendant class of inmates in this case who oppose the release of HIV-positive prisoners into the general prison population is an indicator of significant opposition that could likely degenerate into active violence within the Alabama system should reintegration occur. Although disputed by the appellants, appellees' assertion that such increased violence would in fact be a consequence of reintegration was supported by testimony of correctional officials, inmates, and appellees' expert witness, Dr. Nadim Koury.[33] In addition, there was testimony that integration of HIV-positives into the general inmate population would also generate significant negative effects on prison guards--that some guards, not knowing who was seropositive, would end up resorting to physical force more quickly (R22-[trans. vol. 12(b) ]-34-35) (testimony of Warden White),[34] while others would be hesitant to break up fights that involved blood being "thrown around and splattered." (R23-[trans. vol. 13]-111-12) (testimony of DOC official Thomas Allen).
 
 
 81
 Both of these effects clearly implicate the DOC's self evident interest in preserving the order and security of Alabama prisons, particularly since the potential "ripple effect" of seropositive inmates' attempt to preserve their privacy rights through interaction with the general prison population affects the inmates and staff at more than one institution. See Turner, 482 U.S. at 92, 107 S.Ct. at 2263. Where, as here, integrating seropositive prisoners poses a realistic threat of violence in the prisons, we think that the choice made by Alabama correctional officials--"which is, after all, a judgment 'peculiarly within [their] province and professional expertise,' Pell v. Procunier, 417 U.S., at 827 [94 S.Ct. at 2806]--should not lightly be set aside." Turner, 482 U.S. at 92-93, 107 S.Ct. at 2263-2264.
 
 
 82
 4. "Exaggerated response"
 
 
 83
 According to the final factor cited in Turner, courts may consider the absence of ready alternatives as evidence of the reasonableness of a prison regulation; correspondingly, the existence of "obvious, easy alternatives" may be considered as evidence that a prison restriction is not reasonable, but merely "an 'exaggerated response' to prison concerns." Id. at 90, 107 S.Ct. at 2262. Thus, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 91, 107 S.Ct. at 2262.
 
 
 84
 Despite appellants' claim in this case, we can divine no simple alternatives to the mandatory segregation policy adopted by the DOC. To be sure, alternatives exist. As suggested earlier, the primary alternative urged by appellants is that of "mainstreaming" HIV-positive prisoners into the general inmate population, combined with counseling and thorough education about the disease and its transmission. As evidenced by the testimony of appellants' experts, variations of this latter correctional approach apparently have gained increasing support in recent years. Nevertheless, if the trend away from mandatory testing and segregation implies that it is perhaps a more extreme approach to the problem of managing HIV in prisons, we are not convinced that Alabama's response can yet be dismissed as an unreasonable, "exaggerated" one. The Supreme Court has emphasized that the consideration of other alternatives to assess a current prison policy or restriction's reasonableness is not a least restrictive means test: "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Turner, 482 U.S. at 90-91, 107 S.Ct. at 2262-2263. Further, the Court has stated that "when prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under Turner." Thornburgh, 490 U.S. at 419, 109 S.Ct. at 1884.
 
 
 85
 In this case the DOC's belief that testing and separation will reduce transmission of HIV, as well as its security concerns attending a policy of "mainstreaming" seropositive prisoners, are at least reasonably founded. It is a fact that the stakes in dealing with HIV infection could not be higher; the disease is communicable, incurable, and certain at some point in the seropositive patient's life to result in a nightmarish death. It is also a fact that high risk behavior occurs disproportionately in prison systems. Alabama is no exception. Undisputed testimony established that high risk behavior such as homosexual relations, IV drug use, tattooing, and ear piercing occurs regularly within the Alabama system, as well as frequent fights and blood spills. The DOC, like all correctional systems confronting the already difficult task of prison administration, has been forced to formulate some response to these problems. That response must incorporate not only the prison's interest in reducing transmission of the disease, but also preserve the prison's "core" security concerns, which include maintaining internal security and minimizing violence within the system. With such objectives in mind, even appellants' experts conceded that two bodies of thought currently exist within correctional and public health communities regarding HIV and AIDS prevention in prisons: mandatory testing and separation versus voluntary testing and education. Although appellants have successfully identified numerous difficulties with the former approach, some quite serious, they have not demonstrated in a convincing manner that the costs to Alabama's legitimate penological goals of adopting the latter as an alternative would be de minimis.
 
 
 86
 The importance of AIDS education in both prisons and the population at large is immense, and, for that matter, not disputed. Both parties agree that education should have a significant role in the correctional response to HIV infection. Considered as a complete alternative to segregation, however, the record indicates that it is also at best an imperfect option. The parties agree that under any system of prison administration, the elimination of high risk behavior, such as homosexual activity or IV drug use, is impossible. Moreover, the extent and speed with which education alone is capable of changing such behavior, particularly among prison populations (who are in a sense recalcitrant to begin with), was disputed at trial. The record indicates that a significant amount of high risk behavior continued to occur in the HIV dorms after inmates had been diagnosed as seropositive[35]; there is simply no basis upon which to conclude that such behavior would not continue to occur if such inmates were mainstreamed. The anticipated violent reaction by some general population prisoners to integration is likely predicated on fear, some of it irrational and magnified by misinformation; such fear might or might not be allayed with more education about the disease than is already being provided.[36] Given the distressingly high stakes, however, we do not think that the evidence in the record is so substantial as to indicate that the DOC's conservative approach is an "exaggerated response" to the presence of the disease. See Pell, 417 U.S. at 827, 94 S.Ct. at 2806.[37]
 
 
 87
 In short, mandatory testing and segregation still apparently lies within the perimeter of an important correctional policy debate. As such, it represents precisely the type of urgent problem of prison reform and prison administration with which we as a court are "ill equipped to deal." Martinez, 416 U.S. at 405, 94 S.Ct. at 1807.[38] The district court concluded that "knowledge of the identity of AIDS carriers is a matter reasonably related to a legitimate state interest":
 
 
 88
 It is inescapable that correctional systems should attempt to (1) prevent high risk behavior among inmates, (2) make reasonable efforts to protect all inmates from victimization and (3) avoid any practices which could lead to unprotected blood exposure. The bounds of these duties as they relate to AIDS, and whether negligence or constitutional wrongs are involved, have not yet been clearly defined. At this early stage of the diagnosis and treatment of AIDS, these matters should best be left in the hands of prison officials with the help and advice of their medical staffs.
 
 
 89
 Harris, 727 F.Supp. at 1581.
 
 
 90
 Our application of the Turner "reasonable relationship" test to the DOC's policy of uniformly segregating those prisoners who test positive for HIV yields the same conclusion. The DOC's more conservative approach in separating all known seropositives is not in itself constitutionally violative. To the extent that the segregation policy encroaches upon the privacy rights of HIV-positive inmates, it is a reasonable infringement in light of the inmate interests at stake (both seropositive and general population), and the difficult decisions that the DOC must make in determining how best to treat and control within Alabama correctional facilities the spread of a communicable, incurable, always fatal disease.[39]
 
 
 91
 Rehabilitation Act.
 
 
 92
 In accordance with the DOC's segregation policy, it appears to be undisputed that prisoners who test positive for HIV have been categorically separated from virtually all aspects of general population institutional life, e.g. housing assignments, education, employment, recreation, dining, law library use, religious services, family visitation, transportation, sick call, and canteen. As a result, they have not been able to participate in most of the programs available to general population prisoners, while in other cases, the segregated programming provided to them is not comparable.[40] Appellants claimed at trial that such categorical exclusion from prison programs was violative of section 504 of the Rehabilitation Act of 1973, 87 Stat. 394 (1973) (codified as amended at 29 U.S.C. § 794 (1988)). The trial court denied relief on this claim, determining that appellants were not "otherwise qualified" within the meaning of the Act.
 
 
 93
 Section 504 of the Rehabilitation Act prohibits a federally funded state program from discriminating against a handicapped individual solely on the basis of the individual's handicap. School Board of Nassau County v. Arline, 480 U.S. 273, 275, 107 S.Ct. 1123, 1125, 94 L.Ed.2d 307 (1987). Specifically, the Act states:
 
 
 94
 No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
 
 
 95
 29 U.S.C. § 794 (1982).
 
 
 96
 As the text of the statute suggests, in order to obtain relief under section 504 appellants must establish that: 1) they are "handicapped" within the meaning of the Act; 2) they are "otherwise qualified"; 3) they are excluded from programs or activities solely because of the handicap; and 4) the programs or activities from which they are excluded are operated by an agency that receives federal financial assistance.
 
 
 97
 The record indicates no dispute as to the latter two elements. It is clear that the DOC receives federal financial assistance. Moreover, the DOC concedes that section 504 applies to prisoners.[41] In addition, to the extent that seropositive individuals are considered "handicapped," there is no dispute in this case that they are excluded from programs and activities solely because of their HIV-positive status. The first two elements merit a bit more attention.
 
 
 98
 1. "Handicapped Individual "
 
 
 99
 For the limited purposes of this appeal, we also believe that the prisoner-appellant class members have satisfied the threshold criterion of demonstrating a "handicap" within the meaning of the Rehabilitation Act. The district court confined its brief discussion of section 504 only to the question of whether appellants were "otherwise qualified," evidently assuming that appellants were in fact " 'handicapped with a contagious disease.' " Harris, 727 F.Supp. at 1582 (quoting Martinez By and Through Martinez v. School Board, 861 F.2d 1502, 1505 (11th Cir.1988)). We agree with this assumption, although the issue is not entirely free from debate.
 
 
 100
 As opposed to later-stage AIDS, the scope of section 504's application as it pertains solely to a plaintiff's HIV-positive status is not entirely settled. A "handicapped person" within the meaning of the Rehabilitation Act is "any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(7)(B) (1982) (renumbered as § 706(8)(B)); 45 C.F.R. § 84.3(j)(1) (1990). In considering whether persons with contagious diseases may be considered "handicapped" under the Act, the Supreme Court in School Board v. Arline affirmed our circuit's holding in Arline v. School Board, 772 F.2d 759, 764 (11th Cir.1985), that contagious diseases "fall neatly" within the statutory and regulatory framework of the Rehabilitation Act. Arline, 480 U.S. at 277, 107 S.Ct. at 1125. The Court, however, expressly left open the questions of whether asymptomatic carriers of a disease such as AIDS could be considered "physically impaired," or whether such persons could be considered "handicapped" solely on the basis of their contagiousness. Id. at 282 n. 7, 107 S.Ct. at 1128 n. 7.[42] In the instant case, it is undisputed that the DOC categorically denies HIV-positive prisoners access to programs by virtue of their seropositive status alone (not physical impairment, behavior or any other classification factor) for the stated purpose of reducing transmission of the disease; the DOC, in other words, excludes seropositive prisoners from programs solely on the basis of contagiousness. Any application of the Rehabilitation Act here thus confronts the precise question left unanswered by the Supreme Court in Arline.[43]
 
 
 101
 Nevertheless, on the facts of this case, we are not inclined to disagree with the district court's assumption that the HIV-infected prisoners are "handicapped individuals" within the meaning of section 504 of the Rehabilitation Act. The definition of "handicapped individual" applies to persons who are "regarded as having" a physical or mental impairment. 29 U.S.C. § 706(7)(B)(iii) (1982) (now § 706(8)(B)(iii) (1988)). Implementing regulations provide that persons are "regarded as having an impairment" if they are treated by the recipient of federal funds as if they were handicapped--regardless of their actual condition. See Leckelt v. Board of Comm'rs of Hosp. Dist. No. 1, 909 F.2d 820, 825 (5th Cir.1990); Carter v. Orleans Parish Pub. Schools, 725 F.2d 261, 262-63 (5th Cir.1984). Specifically, 45 C.F.R. § 84.3(j)(2)(iv) provides:
 
 
 102
 (iv) "Is regarded as having an impairment" means (A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by a [federal funds] recipient as constituting such a limitation; (B) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others towards such impairment; or (C) has none of the impairments defined in paragraph (j)(2)(i) of this section but is treated by a recipient as having such an impairment.[44]
 
 
 103
 Alabama's blanket, differential treatment of seropositive inmates with regard to available activities and programs is based solely on the fact of the inmates' infection with HIV. Whether or not asymptomatic HIV infection alone is defined as an actual "physical impairment," it is clear that this correctional system treats the inmates such that they are unable, or perceived as unable, to engage in "major life activities" relative to the rest of the prison population.[45] Regardless of whether such treatment is ultimately justifiable, based as it is on the DOC's fear of and desire to contain the widespread contagion of HIV in Alabama prisons, we believe that it is appropriate in this case to find seropositivity a "handicap" within the meaning of the Act.[46]2. "Otherwise Qualified "
 
 
 104
 The final issue regarding the application of section 504 in this case is the only one that the trial court addressed, albeit in cursory fashion. In order to obtain relief under the Rehabilitation Act, even if they are considered "handicapped," appellants must also establish that they are "otherwise qualified" for the programs or activities from which they have been excluded. The analysis actually breaks down into two steps.
 
 
 105
 First, the trial judge must determine whether the handicapped individual is "otherwise qualified." Martinez By and Through Martinez v. School Bd., 861 F.2d 1502, 1505 (11th Cir.1988). "An 'otherwise qualified' person is one who is able to meet all of a program's requirements in spite of his handicap." Southeastern Community College v. Davis, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). When the individual's handicap is in the nature of a contagious disease, this determination requires the trial judge to conduct an individualized inquiry, and to make appropriate findings of fact. Martinez, 861 F.2d at 1505; see Arline, 480 U.S. at 287, 107 S.Ct. at 1130. The court's factual inquiry should include findings, "based on reasonable medical judgments given the state of medical knowledge," concerning
 
 
 106
 "(a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm."
 
 
 107
 Arline, 480 U.S. at 288, 107 S.Ct. at 1131 (quoting Brief for American Medical Assoc. as Amicus Curiae 19). Secondly, if the individual does not appear initially to be otherwise qualified, the court must nevertheless evaluate, in light of the aforementioned medical findings, whether "reasonable accommodations would make the handicapped individual otherwise qualified." Martinez, 861 F.2d at 1505 (citing Arline, 480 U.S. at 288, 107 S.Ct. at 1131). If, after reasonable accommodations, a significant risk of transmission of the infectious disease still exists, a plaintiff will not be considered "otherwise qualified" within the meaning of the Rehabilitation Act. Id. at 1506; see Arline, 480 U.S. at 287 n. 16, 107 S.Ct. at 1131 n. 16.
 
 
 108
 In this case, applying the above factors to the seropositive prisoners, the trial judge found as follows:
 
 
 109
 (1) [HIV] is transmitted by contact of open wounds or body cavities with blood, semen or vaginal secretions. The primary ways the disease is transmitted in the prison environment is through homosexual activity, intravenous drug use and tattooing. Exchange of bodily fluids by homosexual rape or of blood resulting from fights is particularly hazardous in prison settings.
 
 
 110
 (2) The duration of the risk is perpetual.
 
 
 111
 (3) The severity of the risk is great with the potential harm to third parties' [SIC] ultimately being death.
 
 
 112
 (4) The probability of transmission, in the prison environment, is significant.
 
 
 113
 Harris, 727 F.Supp. at 1582. Accordingly, the district court found that "AIDS infected inmates are not otherwise qualified" within the meaning of section 504. Id. at 1583. The court next determined in a conclusory manner that even "after reasonable accommodations, a significant risk of transmission would still exist," offering no support for this proposition other than incorporating "its earlier finds with respect to the reasons that support segregation." Harris, 727 F.Supp. at 1583. Thus, the court found appellants not "otherwise qualified" under the Rehabilitation Act, and denied relief on this claim.
 
 
 114
 The district court's conclusions may prove ultimately correct. Its analysis, however, is devoid of the kind of individualized inquiry and findings of fact necessary to determine whether the members of the appellant class are "otherwise qualified" for any of the programs or activities offered to other prisoners by the DOC, or whether they can become so through reasonable accommodation.
 
 
 115
 First, we believe that the district court erred in its application of the fourth factor cited in Arline--the " 'probabilities the disease will be transmitted and will cause varying degrees of harm.' " Arline, 480 U.S. at 288, 107 S.Ct. at 1131. The district court found merely that "[t]he probability of transmission, in the prison environment, is significant." Harris, 727 F.Supp. at 1582. In this regard, we agree somewhat with appellants that the trial court asked and answered the wrong question. The Rehabilitation Act deals with the exclusion of "otherwise qualified" handicapped individuals from specific programs; an "otherwise qualified" person is "one who is able to meet all of a program's requirements in spite of his handicap." Davis, 442 U.S. at 406, 99 S.Ct. at 2367 (emphasis added). In this case, the district court should have determined the risk of transmission not merely with regard to prison in general, but with regard to each program from which appellants have been automatically excluded.
 
 
 116
 As suggested, it may turn out that the court's conclusion of the significance of the risk of HIV transmission with regard to each program will be unaltered.[47] But even if the risk is significant, the court is then obligated to examine as to each program whether "reasonable accommodations" by the DOC could minimize such risk to an acceptable level. Moreover, it is not enough for the district court simply to rely on general findings and prison policy reasons that support segregation. In this context, like other contexts, the purpose of the Act is to provide a balance--to assure through particularized inquiry that appropriate weight is given to the legitimate concerns of the prison-grantee in avoiding exposure of others to significant health risks, while at the same time protecting the handicapped, contagious prisoners from sweeping deprivations based on prejudice, stereotypes or unfounded fear. See Arline, 480 U.S. at 287, 107 S.Ct. at 1130. We do not believe, as appellants suggest, that the application of the Rehabilitation Act in the unique, complex context of prison administration necessarily requires integration of seropositive prisoners into the general prison population, or integration into general population programs. We also do not believe, however, that the prison's choice of blanket segregation should alone insulate the DOC from its affirmative obligation under the Act to pursue and implement such alternative, reasonable accommodations as are possible[48] for HIV-positive prisoners with respect to various programs and activities that are available to the prison populations at large.
 
 
 117
 Accordingly, we remand this issue to the district court for a particularized inquiry with full findings of fact and conclusions of law as to each program and activity from which HIV-positive prisoners are being excluded, and a proper weighing of the dangers of transmission in each context.
 
 Access to Courts
 
 118
 Appellants finally contend that the district court erred in failing to order relief on the claimed violation by the DOC of appellants' constitutional right of access to courts. Specifically, appellants alleged that the DOC had failed to provide sufficient and meaningful access for HIV-positive prisoners to the prison law library or, in the alternative, if access is denied, provide assistance of a person with legal training. Harris, 727 F.Supp. at 1578.
 
 
 119
 As the trial court recognized, inmates infected with HIV, like all other prisoners, possess a fundamental constitutional right of access to the courts. See Bounds v. Smith, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977); Barfield v. Brierton, 883 F.2d 923, 937 (11th Cir.1989). This right cannot be impaired by prison officials; it " 'requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.' " Barfield, 883 F.2d at 937 (quoting Bounds, 430 U.S. at 828); see Wolff v. McDonnell, 418 U.S. 539, 578-80, 94 S.Ct. 2963, 2985-87, 41 L.Ed.2d 935 (1974).
 
 
 120
 The trial court found that "[b]ased upon the evidence before this Court, it appears that the AIDS infected inmates are entitled to more time in the library than has been allotted." Harris, 727 F.Supp. at 1578. The court also found that "[p]resently, there does not exist sufficient evidence to determine whether or not constitutionally adequate assistance is available." Id. at 1579. Citing the deference that is typically due prison officials in implementing policy, the court opined that the DOC should "formulate a plan that would allow for more time in the library or, in the alternative, assure effective assistance by one trained in the law." Id. The court nevertheless did not order such relief, instead concluding that "the recent policy with respect to library hours does not constitute a denial of meaningful access to prison legal materials nor does it deny them their right of access to courts in violation of the First or Fourteenth Amendment." Id. at 1583.
 
 
 121
 We agree with the plaintiffs that the court's conclusion seems inconsistent with its findings that HIV-infected prisoners were entitled to more library time, and that insufficient evidence existed to determine whether constitutionally adequate assistance was available. Further, because the issue and adequacy of separate access to legal materials and assistance for HIV-positive prisoners is much akin to the inquiries that we have asked the trial court to undertake on remand with regard to appellants' Rehabilitation Act claim, we are obliged to remand this claim as well for additional findings and clarification by the district court.
 
 
 122
 CONCLUSION.
 
 
 123
 For the foregoing reasons, the judgment of the district court regarding appellants' medical care and privacy claims is AFFIRMED. Appellants' Rehabilitation Act and access to courts claims are REMANDED for further proceedings consistent with this opinion.[49]
 
 
 
 *
 Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 A recent National Institute of Justice update remarked:
 Prisons and jails are squarely in the public eye as they attempt to deal with the difficult issues posed by AIDS. Correctional administrators must address many of the same issues faced by public health and other government officials beyond the walls--education, testing, confidentiality, infection control--as well as others not as central to the response on the outside--segregated housing, rape, and other violent victimization.
 T. Hammett, Update 1988: Aids in Correctional Facilities 1, National Inst. of Justice: Issues and Practices (Jan.1989) (Pl.Exh. 376) [hereinafter Update 1988 ].
 
 
 [2]
 Ala.Code § 22-11A-17(a) (1990) provides in pertinent part:
 (a) All persons sentenced to confinement or imprisonment in any city or county jail or any state correctional facility for 30 or more consecutive days shall be tested for those sexually transmitted diseases designated by the state board of health, upon entering the facility, and any inmate so confined for more than 90 days shall be examined for those sexually transmitted diseases 30 days before release. The results of any positive or reactive tests shall be reported as provided....
 
 
 [3]
 As mentioned, the ELISA and Western Blot tests are not tests for AIDS, nor do they detect the presence of the HIV virus itself. Rather, the tests reveal the presence in the blood of antibodies to the virus, which evidence the immune system's attempt to fight off infection. The ELISA test was originally developed to screen the nation's blood supply, and was very effective for that purpose. As the Alabama system's policy reveals, however, antibody tests such as the ELISA have in recent years been used to screen people. In this regard, because the ELISA test may produce a significant number of false positives, the Center for Disease Control ("CDC") strongly recommends that initially positive specimens be subjected to a second ELISA test, and that a more accurate test, such as the Western Blot, be used to confirm the ELISA result. See T. Hammett, Aids in Correctional Facilities 4, National Inst. of Justice: Issues and Practices (3d ed. Apr.1988) (Def.Exh. 511) [hereinafter Correctional Facilities ]. When this sequence of tests is used, the tests have proven extremely accurate, with very few false positives. " '[W]hen performed under well controlled conditions in good laboratories, [the current sequence of tests] yield[s] both a sensitivity and specificity of greater than 99.8 percent.' " Virgin Islands v. Roberts, 756 F.Supp. 898, 900 (D.V.I.1991) (quoting Report of the Presidential Commission on the Human Immunodeficiency Virus Epidemic 2 (June 1988))
 Nevertheless, there is a continuing debate over the reliability of the tests, particularly when used to mass screen in the correctional setting. Because of the apparent lag time, which is usually 6-12 weeks, between HIV infection and the appearance of detectable antibodies, there is a "window period" during which an infected person would nevertheless test negative, yielding a so-called "false negative." This means that "it is impossible to guarantee detection of all infected members of a population through one-time screening." Correctional Facilities, supra, at 61.
 
 
 [4]
 HIV "seropositivity" simply means that a person possesses HIV antibodies, which indicates that HIV infection has occurred at some time in the past. Although antibody tests such as the ELISA cannot pinpoint the date of infection, the CDC's present position is that, for purposes of counseling and public health recommendations, any seropositive person should be considered HIV-infected and potentially infectious. "[T]he view commonly presented in articles regarding AIDS (as well as in some correctional departments' educational material and policy statements) that HIV seropositivity merely indicates possible 'exposure' to the virus is considered by many physicians and epidemiologists to be a serious misunderstanding." Correctional Facilities, supra note 3, at 6. Seropositivity is a serious problem, because the potentially indefinite incubation period of AIDS renders it virtually impossible for a seropositive person "to know for certain that he or she is free from risk of becoming ill or infecting others." Id. Nevertheless, "[e]vidence continues to accumulate that virtually everyone infected with the virus will, sooner or later, progress to active disease." Update 1988, supra note 1, at 5
 
 
 [5]
 A small number of HIV seropositive male inmates with security classifications of close, maximum or protective are kept in cells at Limestone
 
 
 [6]
 Specifically, as the trial court found, plaintiffs argued that the DOC had violated various constitutional and federal rights of the inmates by allegedly engaging in the following practices: 1) requiring all prisoners to submit involuntarily to blood tests upon entrance into and exit from Alabama penal institutions; 2) failing to advise prisoners as to the inconclusive and sometimes misleading significance of the results; 3) failing to provide essential emotional support and mental health counseling to those prisoners who test positive; 4) compelling seropositive prisoners to live in segregated units (like "leper colonies") with all other prisoners who have tested positive for HIV; 5) publically branding the inmates, through the fact of their segregation, as carriers of a dread, socially unacceptable and fatal disease; 6) causing the infected inmates to lose the opportunity to participate in vocational and educational programs, to earn good time credits, and to participate in work release and similar programs, thus limiting the prisoners' opportunities for early release and parole; and 7) providing the inmates with grossly deficient medical, mental health, and dental care. Harris v. Thigpen, 727 F.Supp. 1564, 1566 (M.D.Ala.1990)
 
 
 [7]
 At the time of trial, named defendants to the action were as follows: 1) Morris Thigpen, Commissioner of the DOC, responsible for the DOC's control, as well as the enforcement of rules concerning the testing and segregation of inmates; 2) Jean Hare, the Warden of Tutwiler, charged with administering the HIV segregation unit there; 3) J.D. White, the Warden of Limestone, charged with the administration of the HIV segregation unit at Limestone; Lynn Harrelson, Warden of the Kilby Prison in Mt. Meigs, Alabama, charged with implementing the HIV testing program at Kilby; Correctional Health Care, Inc. ("CHC"), an entity under contract with the DOC to provide medical care services to Alabama state prisoners; and Dr. George Sutton, Medical Director for CHC. Harris, 727 F.Supp. at 1566. Prior to the trial's commencement, defendant CHC stipulated that it was the DOC's contractual health care provider, and that it would comply with any final order entered by the court relative to medical care for HIV-positive prisoners. The court accordingly dismissed CHC subject to this stipulation. (R11-[trans. vol. 1]-22-24)
 
 
 [8]
 Although the battle against HIV infection is often characterized in terms of an "epidemic," it should be noted that the data suggest that there is not yet a general epidemic of HIV infection in the United States. Rather, the struggle to contain the spread of the disease is perhaps better conceptualized as "a series of smaller, overlapping epidemics--for example homosexual men, IV [intravenous] drug users, and sexual partners of IV drug users--each with its own dynamic, history, and projected course." Update 1988, supra note 1, at 16 (citing J.W. Curran, Epidemiology of HIV Infection and AIDS in the United States, Science, 239:613 (Feb. 5, 1988))
 
 
 [9]
 Thus, the Presidential Commission studying the epidemic observed: "The medical, public health, political, and community leadership must focus on the full course of HIV infection rather than concentrating on later stages of the disease (ARC [AIDS-Related Complex] and AIDS)." Report of the Presidential Commission on the HIV Epidemic at XVII (June 24, 1988) (Pl.Exh. 408)
 
 
 [10]
 For example, an editorial in the New England Journal of Medicine has suggested that the process of HIV infection may be broken down into three stages: (1) the early or acute stage, which usually lasts weeks; (2) the middle or chronic stage, which can last years and is characterized by " 'minimal, but measurable, pathologic changes' "; and (3) the final or crisis stage, generally termed "AIDS" and lasting months or years, depending in part on availability of treatment. Moini & Hammett, 1989 Update: Aids in Correctional Facilities 1, National Inst. of Justice: Issues and Practices (May 1990) [hereinafter 1989 Update ] (citing D. Baltimore & M. Feinberg, HIV Revealed: Toward a Natural History of the Infection, New England Journal of Medicine, 321:1673-75 (Dec. 14, 1989))
 Over time, HIV-infected persons may begin to develop symptoms such as weight loss, malaise, fatigue, anorexia, abdominal discomfort, diarrhea with no specific cause, night sweats, headaches, and swollen lymph glands. Casual Contact and the Risk of HIV Infection, Report of Special Initiative on AIDS, APHA, at 1 (July 1988) (Pl.Exh. 424) [hereinafter Casual Contact ]. AIDS itself, as mentioned, is characterized by the development of some type of opportunistic infection in HIV-infected persons, as the patient's increasingly deteriorating immune system is no longer able to respond. Id. One infection common to AIDS patients, and especially AIDS-afflicted inmates, is a form of pneumonia called Pneumocystis carinii ("PCP"). See id.; Correctional Facilities, supra note 3, at 3. As appellants' expert witness, Dr. Thomas Brewer of the Johns Hopkins School of Hygiene and Public Health, testified, "[p]robably half the people in this room have [the protozoan] pneumocystis in their respiratory tract, in one place or another. We don't come down with pneumocystis pneumonia unless our immune system has been damaged. So, that is what we mean by opportunistic disease." (R11-[trans. vol. 1]-39).
 
 
 [11]
 It should also be pointed out, however, that points along the continuum of illness "cannot be considered simply as stages of an orderly progression in the spectrum of HIV infection." Institute of Medicine, National Academy of Sciences, Confronting Aids: Directions for Public Health, Health Care, and Research (Washington, D.C., 1986), at 46. For "individuals who do pass through these conditions sequentially, there is no standard rate or pace of progression. Some patients remain asymptomatic for long periods--perhaps indefinitely--while others quickly develop end-stage AIDS and die. What causes these wide variations in clinical history is not known." Correctional Facilities, supra note 3, at 4
 
 
 [12]
 "Sexual transmission has been most common among homosexual men, although heterosexual transmission has been clearly established." Update 1988, supra note 1, at 11. "[A]nal intercourse (especially for the receptive, as opposed to the insertive, partner) and other practices that may involve trauma or bleeding" have been determined to be especially risky with regard to transmission of HIV infection. Correctional Facilities, supra note 3, at 9. Anal intercourse is considered far more likely than vaginal intercourse to result in direct insertion of the virus into the bloodstream. Id. at 12 (citing Norman, AIDS Trends: Projections from Limited Data, Science, 230:1021 (Nov. 29, 1985)); (R11-[trans. vol. 1]-42) (testimony of Dr. Thomas Brewer)
 Although the future is uncertain, the risk of heterosexual transmission at present still seems to be confined to cases involving direct sexual contact with a member of one of the currently predominant risk groups, such as homosexual and bisexual men, or IV drug users. See id. at 12. Indeed, this fact, along with the estimated low probability of transmission through a single sexual encounter with a member of the non-IV drug using heterosexual population, the apparently much less efficient transmission of the virus from female to male, and the higher incidence of anal intercourse among homosexuals, is often cited by those who argue against a "break-out" of HIV infection in the non-IV drug using heterosexual population. Id. Nevertheless, even accepting this still-debated proposition, heterosexual transmission must continue "to be of concern to correctional administrators--particularly with regard to pre-release education--because intravenous drug users are over-represented among inmate populations." Id.
 
 
 [13]
 Blood-to-blood transmission has occurred primarily through the sharing of needles and paraphernalia by IV drug users, as well as through transfusions of infected blood, and provision of infected blood preparations to hemophiliacs. Update 1988, supra note 1, at 11; see Correctional Facilities, supra note 3, at 12. The latter two modes of transmission have been virtually eliminated by the universal screening of donated blood and by heat treatment of the blood concentrate regularly given to hemophiliacs. Update 1988, supra note 1, at 11. Because exposure to contaminated blood now occurs almost exclusively through needle-sharing by IV drug users, this group has been of particular interest to correctional officials, since it is over-represented among correctional inmates. Correctional Facilities, supra note 3, at 12
 Although small, there is a risk of contracting HIV infection from accidental punctures and needlesticks; this occurs when contaminated blood present on a needle or instrument comes into contact with the person suffering the wound. Correctional Facilities, supra note 3, at 13-14. As of 1989, there were at least 15 well-documented cases of on-the-job infection of health care workers, including nurses, medical technicians, laboratory technicians and dentists--although a number of these infections apparently were caused by a failure to follow established precautionary procedures. Update 1988, supra note 1, at 11-12.
 Finally, there is also a very slight risk of contracting HIV infection through non-needlestick, open-wound or mucous membrane (e.g. eyes, nose, mouth) exposure. Such cases have involved health-care workers whose broken skin or mucous membranes have come into contact with contaminated blood, usually as a result of failure to follow CDC-recommended precautions. Correctional Facilities, supra note 3, at 14.
 
 
 [14]
 Perinatal transmission occurs when an unborn infant is infected by the mother during pregnancy, through exposure to infected blood and other fluids during labor and delivery, and possibly in one case, through infected breastmilk. Casual Contact, supra note 10, at 2; see Correctional Facilities, supra note 3, at 14. Most children with AIDS have had at least one parent either with AIDS or in a group at high risk for HIV infection. Correctional Facilities, supra note 3, at 14
 
 
 [15]
 The goal of producing an HIV vaccine
 is extremely elusive and new knowledge about the virus as often frustrates as contributes to progress on vaccine development. HIV is a retrovirus, which means that it invades and incorporates itself into the genetic material. It is thus more hidden than an ordinary virus, and it tends to change its guise, rendering it, in effect, a "moving target" difficult to attack with a single, static vaccine.
 Correctional Facilities, supra note 3, at 17. Although significant strides have been made in the development of AIDS vaccines, canvass of progress at the end of 1989 estimated that "it still may be five to ten years before an effective AIDS vaccine is widely available for human use." 1989 Update, supra note 10, at 3 (citing Bolognesi, Progress in Vaccines Against AIDS, Science, 246:1233-34 (Dec. 8, 1989)).
 
 
 [16]
 At the outset, we agree with appellants that the trial court's discussion of medical (physical and psychological) care of the seropositive inmates could have been more helpful by providing complete, specific findings of fact to support its conclusions, as indeed is called for the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 52(a) (providing that "[i]n all actions tried upon the facts without a jury, ... the court shall find on the facts specially and state separately its conclusions of law thereon"). Nevertheless, Rule 52(a) is not a jurisdictional requirement; it is simply intended to provide an adequate basis for appellate review of a district court's decision. "[A] remand is not required 'if a complete understanding of the issues may be had without the aid of separate findings.' " Armstrong v. Collier, 536 F.2d 72, 77 (5th Cir.1976) (citation omitted). The parties have done a good job of referring us to relevant portions of the record. On this issue, the record is well developed, and a remand is unnecessary to aid our evaluation of appellants' contentions. See id
 
 
 [17]
 The Supreme Court has recently clarified that the "deliberate indifference" standard, which states the culpable state of mind required of prisons in eighth amendment claims involving inadequate or improper medical care, also applies generally to prisoners' eighth amendment challenges to their conditions of confinement. Wilson v. Seiter, --- U.S. ----, ----, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)
 
 
 [18]
 The eighth amendment applies to the states through the due process clause of the fourteenth amendment. Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962)
 
 
 [19]
 In addition, the policy of deferring to the judgment of prison officials in matters of prison discipline and security does not usually apply in the context of medical care to the same degree as in other contexts. Wellman v. Faulkner, 715 F.2d 269, 272 (7th Cir.1983) (citation omitted), cert. denied, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984)
 
 
 [20]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981
 
 
 [21]
 Dr. Sutton testified that a physician is available at Limestone and Tutwiler for one-half of a day, each day of the week. (R21-[trans. vol. 11]-107). Although actual hours vary with the workload and the facility, Dr. Sutton indicated that physicians quite often spend more than a half-day at the institutions until they have fully completed sick call, which can be as much as eight to ten hours a day. (R21-[trans. vol. 11]-110). Sutton testified that physicians at both Limestone and Tutwiler devote a routine sick call to HIV-positive inmates one day each week. (R21-[trans. vol. 11]-122). During the remainder of the week HIV-positive inmates may sign up for regular sick call and be seen by a nurse at triage within 24 hours; every such encounter is reviewed by the next day's physician, and the patient called in if necessary. (R21-[trans. vol. 11]-198). In cases of urgency, both Sutton and local physicians are on call, and the patient will not be delayed until the next available HIV sick call--seven days a week they would go to the nearest appropriate acute health care facility. Id
 According to Sutton, CHC also has elected to offer inmates approximately 120 consults of free world physician time on a state-wide basis. (R21-[trans. vol. 11]-191). Thus, although plaintiff's expert Dr. Rundle testified that the institutions at Tutwiler and Limestone were understaffed because "the usual guideline is one full-time physician for every five or six hundred inmates," (R19-[trans. vol. 9]-2, 4), Sutton suggested that the manning documents for the prisons may not reflect, in terms of physician equivalence, the "many, many resources" (such as free world resources) that are utilized by the Alabama system. See (R21-[trans. vol. 11]-191-92).
 
 
 [22]
 Dr. Sutton testified that he has assumed a direct role in the treatment of the seropositive inmates (R21-[trans. vol. 11]-63). With respect to HIV-positive prisoners at Limestone and Tutwiler, he reads the T-4 test results and makes all general treatment decisions. (R21-[trans. vol. 11]-71). This involves, for example, written communication with Dr. Pendleton, a primary care physician for the inmates, and a Ms. Baxley, the Director of Nursing at Limestone, on a daily basis. (R21-[trans. vol. 11]-113). Sutton also apparently visits Limestone personally two days a month, typically examining 20-40 inmates, approximately half of whom are HIV-positive. Sutton spends up to an hour per day reviewing the status and treatment regimens of HIV-positive prisoners, and about one-third of his time monitoring CHC's consultation requests, drug requests, T-4 cell counts, blood counts, and other CHC lab work. (R21-[trans. vol. 11]-113-14). While primary care physicians like Drs. Benson and Pendleton make recommendations as attending physicians, Dr. Sutton makes the "judgment calls" regarding the treatment of seropositive prisoners. (R21-[trans. vol. 11]-203). Dr. Sutton's testimony at trial evidenced a thorough and detailed clinical knowledge of HIV infection and AIDS. In addition to his medical credentials, Sutton testified that he had seventeen HIV-positive patients in his private practice, and regularly participated in a monthly HIV-treater workshop sponsored by Burroughs Wellcome (currently the sole manufacturer of AZT) and the University of South Alabama. (R21-[trans. vol. 11]-68)
 CHC assumed contractual responsibility for the health care of DOC inmates in November, 1988. Dr. Sutton testified that in March or April of 1989, he decided in his capacity as medical director to implement an aggressive medical treatment program for HIV inmates. The first element of this program was the implementation of periodic T-4 cell count testing to determine the current immunologic status of the inmates. (R21-[trans. vol. 11]-65-66). Next, after evaluating the reliability of those counts in a laboratory or clinical setting, he helped develop a program and protocol to aggressively administer AZT to those HIV-infected prisoners with a persistently low T-4 count with the absence of any other clinical finding; those with a rapidly dropping T-4 count and with or without any concurrent secondary infections; or those with any of the opportunistic infections that have been identified as comorbidity factors with AIDS with any compromise of the CD4 count. (R21-[trans. vol. 11]-66-67). Since April of 1989, all T-4 blood cells have been reported to the nursing director and local physician at each facility, as well as to Sutton personally by fax machine the same day by the director of nursing at Limestone or Tutwiler. (R21-[trans. vol. 11]-70). Abnormal counts are repeated and read by an independent lab in Birmingham, Alabama. (R21-[trans. vol. 11]-69).
 
 
 [23]
 Although not licensed by the state of Alabama, Ms. Hendricks-Ortiz testified that she had earned a double master's degree in educational psychology and counseling, as well as attended various workshops dealing especially with the AIDS virus
 
 
 [24]
 Moreover, some of the testimony evidently meant to establish the DOC's "deliberate indifference" to serious mental health needs dealt with the manner in which the DOC's policy of separating HIV-positive prisoners accentuated the "atmosphere of depression, sometimes to the point of despair, of hopelessness, of futility, of the purposelessness of life; this isolated life.... a resentment and a sense of the injustice of the conditions of [the HIV] unit and why they are being kept there under these conditions." (R17-[trans. vol. 7]-127) (testimony of Dr. Frank Rundle). The problem with such testimony is that it also describes mental states that are often the byproducts of punishment by incarceration, which by its terms is not intended to be pleasant. In prison, "[f]rustration, resentment and despair are commonplace." Wolff v. McDonnell, 418 U.S. 539, 562, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974). Although we do not wish to be insensitive to the plight of any individual infected with the AIDS virus, the appellants in this case are prisoners as well as patients. Even among the general population prisoners, nonpunitive segregation is the type of confinement reasonably to be expected at some point during incarceration. Hewitt v. Helms, 459 U.S. 460, 468, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983). Further, as Chief Justice Rehnquist has observed,
 nobody promised them a rose garden; and I know of nothing in the Eighth Amendment which requires that they be housed in a manner most pleasing to them, or considered even by most knowledgeable penal authorities to be likely to avoid confrontations, psychological depression, and the like. They have been convicted of crime, and there is nothing in the Constitution which forbids their being penalized as a result of that conviction.
 Atiyeh v. Capps, 449 U.S. 1312, 1315-16, 101 S.Ct. 829, 831-32, 66 L.Ed.2d 785 (1981). To the extent that a reasonably commonplace condition of confinement exacerbates the despair an individual feels at being stricken with a terminal and stigmatizing illness such as HIV disease, or vice versa, it nevertheless in this context seems a measurable extension of eighth amendment jurisprudence to consider the effect of the confinement itself as constituting evidence of "deliberate indifference."
 
 
 [25]
 Preliminarily, we observe that appellants' decision to ground their challenge to the DOC's segregation policy in the rather nebulous right of privacy leads us to tread in "relatively unexplored territory." Doe v. Coughlin, 697 F.Supp. 1234, 1236 (N.D.N.Y.1988). In a few prior federal cases, prisoners have challenged the segregation of HIV-positive or AIDS-afflicted inmates as violative of equal protection, due process, the right of free association, and the right to be free from cruel and unusual punishment; thus far, such challenges have met with little success. Rodriguez v. Coughlin, 1989 WL 59607 at * 2, 1989 U.S.Dist. LEXIS 15898 at * 6-* 7 (W.D.N.Y.1989); Doe, 697 F.Supp. at 1236; see also St. Hilaire v. Arizona Dep't of Corrections, 934 F.2d 324 [table], 1991 WL 90001 at * 2; 1991 U.S.App. LEXIS 11620 at * 6 (9th Cir.1991) (noting that in contrast to suits by non-infected prisoners to compel correctional systems to segregate seropositives, "some courts have upheld prison decisions to quarantine HIV-infected inmates"); Baez v. Rapping, 680 F.Supp. 112, 116 n. 6 (S.D.N.Y.1988) (noting that right of prison administrators to segregate inmates with AIDS has been upheld against challenges based on the first, eighth, and fourteenth amendments) (citing McDuffie v. Rikers Island Medical Dep't, 668 F.Supp. 328, 329 (S.D.N.Y.1987)); see, e.g., Muhammad v. Carlson, 845 F.2d 175, 178-79 (8th Cir.1988) (no liberty interest violated by decision to segregate inmate in restricted AIDS unit), cert. denied, 489 U.S. 1068, 109 S.Ct. 1346, 103 L.Ed.2d 814 (1989); Cordero v. Coughlin, 607 F.Supp. 9, 10-11 (S.D.N.Y.1984) (segregation of AIDS sufferers from general population did not violate afflicted inmates' constitutional rights asserted under first, eighth and fourteenth amendments). Thus, "[p]erhaps chastened by the uniform failure of these attacks, plaintiff has chosen the less travelled path marked by the uncertain borders of the constitutionally protected right of privacy." Doe, 697 F.Supp. at 1236
 
 
 [26]
 Although the Constitution does not explicitly establish a right of privacy, the Supreme Court has recognized for almost a century that certain rights of personal privacy do exist. In Whalen v. Roe, the Supreme Court observed that its "privacy" jurisprudence, grounded primarily in the fourteenth amendment's concept of personal liberty and restrictions upon state action, delineates at least two different kinds of privacy interests. Whalen v. Roe, 429 U.S. 589, 598-99 & n. 23, 97 S.Ct. 869, 875-76 & n. 23, 51 L.Ed.2d 64 (1977). "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." Id. at 599-600, 97 S.Ct. at 876-877 (footnotes omitted)
 Appellants apparently claim that both such interests are implicated in the instant setting. The nature of the right claimed by appellants is perhaps most aptly described as a right to privacy in preventing the non-consensual disclosure of one's medical condition or diagnosis. See Doe v. Coughlin, 697 F.Supp. at 1237. There is some authority supporting such a right, Plowman v. United States Dep't of Army, 698 F.Supp. 627, 633 & n. 22 (E.D.Va.1988), specifically in contexts dealing with HIV-positive prisoners. See, e.g., Doe, 697 F.Supp. at 1237 (acknowledging seropositive inmate class members' right to privacy in preventing non-consensual disclosure of their medical diagnosis); Woods v. White, 689 F.Supp. 874, 876 (W.D.Wis.1988) (despite incarceration, constitutional right to privacy extended to inmate's seropositive status: "[I]t is difficult to argue that information about [AIDS or HIV disease] is not information of the most personal kind, or that an individual would not have an interest in protecting against the dissemination of such information."), aff'd, 899 F.2d 17 (7th Cir.1990); see also St. Hilaire, 1991 WL 90001 at * 2, 1991 U.S.App. LEXIS 11620 at * 6 (speculating that publication of seropositive inmates' HIV status "might violate infected inmates' rights to privacy and confidential medical treatment"); Inmates of New York State With Human Immune Deficiency Virus v. Cuomo, 1991 WL 16032 at * 3, 1991 U.S.Dist. LEXIS 1488 at * 7-* 8 (accepting for purposes of resolving discovery dispute proposition that "the federal Constitution protects against the unwarranted and indiscriminate disclosure of the identity of HIV-infected individuals and their medical records"); Rodriguez, 1989 WL 59607 at * 3, 1989 U.S.Dist. LEXIS at * 10 (finding reasoning supporting constitutional privacy right in disclosure of HIV status to be "eminently persuasive"); Doe v. Meachum, 126 F.R.D. 452, 453 (D.Conn.1989) (quoting passage from Doe v. Coughlin quoted in text above, and recognizing "significant privacy
 interest" of seropositive plaintiff class members in suit challenging policies of Connecticut Dep't of Corrections). But see Cordero v. Coughlin, 607 F.Supp. 9, 10-11 (D.C.N.Y.1984) (segregation of AIDS sufferers from general population did not violate afflicted inmates' numerous asserted constitutional rights, including privacy). The scope of such a right, however, is far from settled, and we need not divine its precise parameters here, given our holding infra that any such right is outweighed by the legitimate penological interests of the Alabama DOC.
 
 
 [27]
 Cf. Doe v. Borough of Barrington, 729 F.Supp. 376 (D.N.J.1990). There, in the context of a civil rights action brought by the wife and children of a citizen whose infection with the AIDS virus was publically disclosed by a police officer, the district court found "persuasive" the rationales of cases that acknowledged a constitutional right to privacy in disclosure of medical records, and reasoned:
 The sensitive nature of medical information about AIDS makes a compelling argument for keeping this information confidential. Society's moral judgments about the high-risk activities associated with the disease, including sexual relations and drug use, make the information of the most personal kind. Also, the privacy interest in one's exposure to the AIDS virus is even greater than one's privacy interest in ordinary medical records because of the stigma that attaches with the disease. The potential for harm in the event of a nonconsensual disclosure is substantial[.]
 Id. at 384.
 
 
 [28]
 The DOC evidently agrees with the testimony of appellant's expert, Dr. Patrick McManus, that "[a]nybody who cares to know can find out who is HIV positive and who is not HIV positive just simply because they are segregated and visually identifiable" (R25-[trans. vol. 15]-55); "confidentiality of HIV positive inmates in this system is gone once they are moved into one of the [HIV] units." (R25-[trans. vol. 15]-56). "Thus, absent the elimination of separation, it is not possible [for the correctional facilities] to maintain the confidentiality of prisoners' HIV status." Brief of Appellees/Cross-Appellants at 3
 
 
 [29]
 As the district court observed:
 [P]rison officials or this Court must also consider the rights of other inmates within the prison walls and whether or not those persons have a right to be shielded from such dangers as are known to prison authorities or may reasonably be expected to result from the close confinement associated with a prison environment which, at best, is volatile. It appears to this Court that the Plaintiffs in this case selfishly assert their rights to expose other inmates to their problems independent of any right of the other inmates to be protected from what is admitted to be a dread fatal disease of the Plaintiffs (all of whom are capable of transmitting the disease). This Court must consider the rights of the general population inmates in determining whether or not the policies in question are constitutionally permissible.
 Harris, 727 F.Supp. at 1572.
 
 
 [30]
 The Court in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), crafted its "reasonable relationship" test in the context of reviewing the constitutionality of two regulations promulgated by the Missouri Division of Corrections, one placing certain restrictions on inmate correspondence, the other allowing an inmate to marry only after obtaining permission of the prison superintendent, which could only be given in the face of "compelling" reasons
 
 
 [31]
 The Court went on to explain its reasons for adopting such a standard:
 In our view, such a standard is necessary if "prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations." Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."
 Turner, 482 U.S. at 89, 107 S.Ct. at 2262 (citations omitted).
 
 
 [32]
 Thus, the DOC's expert, Dr. Nadim Koury, Medical Director for the California Department of Corrections, was asked whether in his opinion the testing of inmates for HIV was important in minimizing the spread of the disease. He responded:
 If you test all inmates and you identify all the inmates infected and you do separate them far from the general population of a prison system in there, then you are minimizing the possibility of altercation; minimizing the possibility of IV drug sharing, which does occur in prison; minimize that, too, needle sharing does occur inside the present system, then, yes. The answer is yes. You will reduce that transmission. Definitely.
 (R23-[trans. vol. 13]-23).
 
 
 [33]
 For example, James White, the Warden of the Limestone facility, testified that in his view, if the separation policy were not maintained, "[w]e will have violence, inmate to inmate," as well as a vast increase in inmates requesting protective custody in order to avoid being exposed to seropositive prisoners. (R22-[trans. vol. 12(b) ]-34). James W. Hayes, a classification supervisor at Limestone, opined that "there would be an increase in the fights between inmates in population, not only between non-HIV inmates and HIV inmates. There would be altercations and fights and aggressive behavior between other inmates for favors ... of some of the HIV inmates." (R20-[trans. vol. 10]-206). One of the defendant-intervenor prisoners, testifying to the fear of prison guards at the prospect of integrating seropositive prisoners with those in the general population, observed, "They don't want the AIDS people in the main population. They know what trouble is going to come. There will be killing." (R14-[trans. vol. 4]-99). In discussing his view of the need for separation of seropositives, Dr. Koury explained:
 Because of my knowledge I can come to a conclusion that you need to have HIV people separated. And the reason is not only on medical basis because of the tuberculosis and syphilis and this way you can provide them good treatment and you can allow your medical staff to concentrate on them to a lot of degree, it is because of the aspect of being seen by the other inmate population as a possible source of infection. Not necessary that they are, but because they can be, as a fact of fist fights or altercations of any kind, and the perception of the inmate population that they are a kind of a troublemaker for them.
 (R23-[trans. vol. 13]-19-20).
 
 
 [34]
 Warden White also expressed concern that there would be a much higher turnover in the number of correctional officers at Limestone if seropositive prisoners were reintegrated without their identities being revealed to correctional staff. (R22-[trans. vol. 12(b) ]-34)
 
 
 [35]
 In addition, there was evidence that a majority of inmates who had already tested positive for HIV infection experienced psychological "denial," and steadfastly denied their seropositivity. Other evidence established that inmates in the HIV unit who had been previously instructed by nursing staff not to engage in high risk behavior nevertheless were subsequently treated for sexually transmitted diseases such as syphilis, gonorrhea, chlamydia, and anal warts acquired through anal intercourse
 
 
 [36]
 The close quarters and heightened occurrences of high-risk activity in prisons undoubtedly accentuate "AIDS phobia" for those who must continually deal with the presence of HIV in the correctional context; " '[w]hen patients with AIDS [or HIV] are discovered in the prison system, there is a crescendo of concern leading to panic on the part of prisoners, correctional staff, as well as the medical staff.' " Note, In Prison with AIDS: The Constitutionality of Mass Screening and Segregation Policies, 1988 U.Ill.L.Rev. 151 (quoting Pear, Prisons Are on the Alert Against AIDS, N.Y. Times, Jan. 12, 1986, at 28E, col. 1)
 However, we are unwilling merely to dismiss as alarmist or illegitimate all of the concerns expressed by the class of general population prisoners that has intervened in this lawsuit. High-risk behavior, particularly IV drug use and homosexual activity (consensual and nonconsensual), is a given in the prison setting, and no correctional approach can eliminate it. Homosexual rape is commonplace. As Justice Blackmun has observed, "[a] youthful inmate can expect to be subjected to homosexual gang rape his first night in jail, or, it has been said, on the way to jail. Weaker inmates become the property of stronger prisoners or gangs, who sell the sexual services of the victim." United States v. Bailey, 444 U.S. 394, 421, 100 S.Ct. 624, 640, 62 L.Ed.2d 575 (1980) (footnotes omitted) (Blackmun, J., dissenting).
 Once the element of an infectious, terminal disease is added to this ugly scenario, the potential variations become even more gruesome. See Harris, 727 F.Supp. at 1581 n. 6. For example, assume that nonviolent seropositive prisoner A is integrated into the general prison population because he appeared to pose no direct threat of HIV transmission. A is raped by inmate B, who as a result contracts HIV. B later forcibly rapes C, further transmitting the disease.
 In the above example, education, as urged by appellants, would alert B to the risk, and would teach him the deadly consequences of his behavior. But suppose B ignores the risk. The above scenario consequently yields not only B, a prisoner who has contracted the disease through his own maliciousness or folly (by ignoring AIDS education), but also C, a completely faultless prisoner whose punishment for whatever crime has now in effect been increased to a sentence of certain death. A, who apparently posed no direct behavioral threat, has nevertheless become an agent for further transmission of the disease in the general population.
 Although the prison obviously has a responsibility to use its best efforts to prevent the attacks upon A and C, as the parties have acknowledged, no system is perfect. Moreover, it is virtually certain that the next lawsuit will be C v. DOC, with C contending that the prison is liable for his harm, since it knew, or should have known, that A was infected with a contagious, deadly disease, and that even under the best circumstances the system could not guarantee that C would not be raped.
 It is not our intent to offer an extended parade of horribles here, particularly because we are not at all sure (nor is it our role to be sure) that the DOC's correctional approach in this case is the best one. We simply offer these thoughts to reinforce our conclusion that Alabama's response to the problem of HIV is at the minimum a reasonable attempt to accommodate the interests of all of the prisoners affected by this case.
 
 
 [37]
 We find unpersuasive appellants' argument that the presence of a "window period" in the DOC's screening procedure, which theoretically allows a small percentage of "false negative" HIV-infected prisoners to enter undetected into the general population, renders the DOC's approach completely unreasonable. It may be, as appellants suggest, that such a "window period" lulls high-risk general population prisoners and correctional authorities into a false sense of security about the general risk of HIV transmission in prison. However, while the presence of a "window period" certainly argues for increased education about the disease, to help prevent transmission by those individuals that have slipped through the net, we fail to see how it argues against separating out those prisoners who have tested positive for the virus. We agree with the district court, which noted: "[I]f, as [appellants'] experts claim, education is the answer, knowledge of the existence of false negatives in the population, coupled with segregation of known carriers, provides protection to those likely to heed precautions and, to a lesser extent, to those who rush on where educated men fear to tread." Harris, 727 F.Supp. at 1581 n. 6
 
 
 [38]
 As the Turner majority observed:
 Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in Martinez, additional reason to accord deference to the appropriate prison authorities.
 Turner, 482 U.S. at 84-85, 107 S.Ct. at 2254-2260 (citation omitted).
 
 
 [39]
 Appellants have also challenged the affirmative disclosure by the DOC of prisoner's HIV status to the Parole Board. In light of our finding that segregation of HIV-infected prisoners, with the disclosure of HIV status that necessarily results, is reasonable, we also find reasonable this additional incursion upon appellants' disclosural privacy rights
 
 
 [40]
 Unlike general population inmates, for example, seropositive prisoners have no access to college classes, other than correspondence classes. Limestone HIV unit prisoners have very few job opportunities, and Tutwiler HIV prisoners have none at all. In some areas, such as recreation, law library, or chapel use, segregated programming is not comparable to that of the general prison population; in others it is altogether nonexistent. In addition, the DOC apparently concedes that seropositive prisoners are not offered any vocational training, nor are they eligible for community placement programs such as Supervised Intensive Restitution (SIR), work release, and Prediscretionary Release (PDL)
 
 
 [41]
 Only the Ninth Circuit appears to have specifically addressed the issue of whether section 504 extends to prisoner claims, see Bonner v. Lewis, 857 F.2d 559, 562 (9th Cir.1988), finding that the broad language of the Rehabilitation Act covering "any program" that receives federal financial assistance, and with the congruence of the Act's goals with those of prison officials, suggest that prisoner claims are potentially cognizable under section 504. Id. We agree
 
 
 [42]
 School Board v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), involved the dismissal of a schoolteacher with recurring tuberculosis. There, the government had conceded that contagious diseases could be handicapping to the extent that they leave people with "diminished physical or mental capabilities," and that the teacher, Arline, possessed a record of physical impairment. Id. at 281, 107 S.Ct. at 1128. The government argued however, that these factors were irrelevant because "the school board dismissed Arline not because of her diminished physical capabilities, but because of the threat that her relapses of tuberculosis posed to the health of others." Id. (footnote omitted). Justice Brennan, writing for the majority, disagreed with the government's notion "that, in defining a handicapped individual under § 504, the contagious effects of a disease can be meaningfully distinguished from the disease's physical effects on a claimant in a case such as this. Arline's contagiousness and her physical impairment each resulted from the same underlying condition, tuberculosis." Id. at 282, 107 S.Ct. at 1128
 Despite this suggestion, however, the Court did not directly address the government's argument that it is possible for persons to be carriers of a disease, capable of transmitting it, without suffering from any symptoms or any type of "physical impairment." Id. at 282 n. 7, 107 S.Ct. at 1128 n. 7. Rather the Court dismissed the government's conclusion--that discrimination solely on the basis of contagiousness is never discrimination on the basis of a handicap--by terming it "misplaced" on the facts, since Arline's tuberculosis gave rise to both physical impairment and contagiousness. Id. Thus, the Court expressly left open the question of "whether a carrier of a contagious disease such as AIDS could be considered to have a physical impairment, or whether such a person could be considered, solely on the basis of contagiousness, a handicapped person as defined by the Act." Id.
 
 
 [43]
 Although it is true, as appellants point out, that our Circuit has previously recognized AIDS as a handicap under section 504, Martinez By and Through Martinez v. School Board, 861 F.2d 1502, 1506 (11th Cir.1988), the scope of this holding for purposes of deciding whether seropositive, asymptomatic carriers of HIV (i.e. those who have not yet progressed to active disease) are to be considered "handicapped individuals" is at least questionable. In Martinez, we found simply that a mentally retarded girl with AIDS suffered "from two handicaps under section 504 of the Rehabilitation Act: she is mentally retarded and has AIDS; each condition results in a 'physical or mental impairment which substantially limits one or more major life activities.' " Id. (citations omitted) (emphasis added). Because by the time of trial the appellant-child in Martinez was a stabilized but advanced-stage AIDS patient who at that point was clearly impaired physically by the disease, it is not clear from the above language whether the panel found AIDS to be a "handicap" simply by virtue of the child's infection with the virus (which the court then considered to be in itself a "physical impairment"), or whether the court's finding of handicap was predicated, as with the Arline plaintiff, upon the presence of both actual physical impairment and contagiousness
 The distinction is obviously important, because if seropositivity alone were not enough to qualify an individual as "handicapped" under section 504, then at least some of the plaintiff class members in this case would be foreclosed from relief on this claim.
 
 
 [44]
 The Arline Court elaborated on this aspect of the definition, the discussion of which is worth noting here in the context of HIV infection:
 By amending the definition of "handicapped individual" to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment. Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness.... The Act is carefully structured to replace such reflexive actions to actual or perceived handicaps with actions based on reasoned and medically sound judgments: the definition of "handicapped individual" is broad, but only those individuals who are both handicapped and otherwise qualified are eligible for relief. The fact that some persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act all persons with actual or perceived contagious diseases. Such exclusion would mean that those accused of being contagious would never have the opportunity to have their condition evaluated in light of medical evidence and a determination made as to whether they were "otherwise qualified." Rather they would be vulnerable to discrimination on the basis of mythology--precisely the type of injury Congress sought to prevent.
 Arline, 480 U.S. at 284-85, 107 S.Ct. at 1129-30 (footnotes omitted) (emphasis in original); see S.Rep. No. 93-1297, 93rd Cong., 2d Sess. 39, reprinted in 1974 U.S.Code Cong. & Admin.News 6373, 6388-89.
 
 
 [45]
 "Major life activities" are defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii) (1990). In prison, many of these activities, such as learning and working, are tied directly to the availability of various activities and programs. Seropositive inmates are treated systemically as if they are unable to participate in such programs, even if this is not in fact the case
 
 
 [46]
 Other courts, including a panel of our Circuit, have either suggested or recognized that seropositivity itself is a "handicap" under section 504. See, e.g. Leckelt v. Board of Comm'rs of Hosp. Dist. No. 1, 909 F.2d 820, 825 (5th Cir.1990) (assuming for purposes of appeal that seropositivity is an impairment protected under section 504, and that hospital officials treated HIV-infected nurse as if he had such an impairment); Doe v. Garrett, 903 F.2d 1455, 1459 (11th Cir.1990) (noting in case involving apparently asymptomatic HIV-carrier that it is "well established that infection with AIDS constitutes a handicap for purposes of the [Rehabilitation] Act"); Glanz v. Vernick, 756 F.Supp. 632, 635 (D.Mass.1991) (noting that several district courts and the Dep't of Justice have found HIV-positive status to be a "handicap" within meaning of Rehabilitation Act); Doe v. Centinela Hosp., 1988 WL 81776 at * 7, 1988 U.S.Dist. LEXIS 8401 at * 18-* 21 (C.D.Cal.1988) (section 504 "handicap" found where "potential for transmission of HIV infection was a one hundred percent limitation on plaintiff's becoming a beneficiary of" drug rehabilitation program; HIV-positive plaintiff was perceived and treated as handicapped by recipient); Thomas v. Atascadero Unified School Dist., 662 F.Supp. 376, 379 (C.D.Cal.1987) (in determining AIDS-infected child to be "handicapped" under section 504, court found that even asymptomatic carriers of AIDS virus were physically impaired by abnormalities in hemic and reproductive systems which make procreation and childbirth dangerous to themselves and others); Local 1812, Am. Fed'n of Government Employees v. United States Dep't of State, 662 F.Supp. 50, 54 (D.D.C.1987) (finding that persons who carry HIV are "handicapped" by either perception that known carriers of the virus will develop incurable, fatal AIDS, or by actual, measurable deficiencies in their immune systems even where disease symptoms have not developed); District 27 Community School Bd. v. Board of Educ., 130 Misc.2d 398, 415, 502 N.Y.S.2d 325, 336 (Sup.Ct.1986) (stating that asymptomatic HIV carriers are within protection of Rehabilitation Act); see also Dep't of Justice, Office of Legal Counsel, Application of Section 504 of the Rehabilitation Act to HIV-infected Individuals (Sept. 27, 1988); cf. Cain v. Hyatt, 734 F.Supp. 671, 678-79 (E.D.Pa.1990) (in suit under Pennsylvania Human Relations Act, court finds consensus of opinion in constructions of various other federal and state antidiscrimination laws, including Rehabilitation Act, that HIV infection is a "handicap," and concludes that even if asymptomatic, plaintiff's HIV infection would constitute "substantial physical limitation on major life activities"); Kohl By Kohl v. Woodhaven Learning Center, 672 F.Supp. 1226, 1236 (W.D.Mo.1987) (finding that asymptomatic infection with contagious hepatitis-B virus is section 504 "handicap," in part due to life-skills and vocational facilities' fear that impairment would pose a threat to third parties). See generally Khan, The Application of Section 504 of the Rehabilitation Act to the Segregation of HIV-Positive Inmates, 65 Wash.L.Rev. 839 (1990); Note, Asymptomatic Infection with the AIDS Virus as a Handicap Under the Rehabilitation Act of 1973, 88 Colum.L.Rev. 563 (1988)
 Notwithstanding what appears to be an emerging consensus on this issue, we wish to emphasize the narrowness of our holding, and confine it only to the record before us. We express no opinion as to whether asymptomatic seropositive individuals would in all contexts be "handicapped" for section 504 purposes.
 
 
 [47]
 Intuitively, however, it seems as if there are several programs or activities in which the risk of transmission would be rather minimal. An example is the participation of the seropositive prisoners in college classes. Other decisions involving the classroom setting in non-prison contexts have determined the risk of transmission to be too remote or insignificant to justify exclusion of the HIV-infected individual. See, e.g., Chalk v. United States Dist. Court, 840 F.2d 701, 707-08 (9th Cir.1988) (ordering grant of preliminary injunction to HIV-infected teacher, where medical evidence showed that there was no significant risk that teacher would communicate disease to others); Ray v. School Dist., 666 F.Supp. 1524, 1535 (M.D.Fla.1987) (granting preliminary injunction prohibiting school district from excluding three seropositive brothers from classroom where "future theoretical harm" of transmission of AIDS virus was unsupported by the weight of the medical evidence); Thomas v. Atascadero Unified School Dist., 662 F.Supp. 376, 380 (C.D.Cal.1987) (granting preliminary injunction prohibiting school district from excluding AIDS-infected child from classroom even after child had been involved in biting incident; court concluded that "[a]ny theoretical risk of transmission of the AIDS virus in connection" with kindergarten attendance was "so remote that it cannot form the basis for any exclusionary action" by school district). We understand, of course, that infected prisoners are different from infected schoolchildren or teachers, and that their presence may pose different risks than those associated with the typical classroom scenario. However, whether the risk of transmission is sufficient to warrant categorical exclusion, and if so, whether that risk can be rendered minimal through accommodation, are findings the district court must make on remand
 
 
 [48]
 Accommodation is not reasonable if it imposes "undue financial and administrative burdens" on a grantee, Southeastern Community College v. Davis, 442 U.S. 397, 412, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979), or if it requires "a fundamental alteration in the nature of [the] program." Id. at 410, 99 S.Ct. at 2369; Arline, 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17
 
 
 [49]
 Prior to the second phase of trial, appellants filed a motion in limine to exclude various exhibits based upon survey data and testimony prepared by appellee's experts, on the basis that it had not been provided to them during discovery. The trial court granted appellants' motion. Appellees filed a motion to reconsider the order, as well as an offer of proof regarding Defendants' Exhibit 482, the so-called "Ingram Study." The trial court denied appellees' motion
 In light of our decision to remand part of this case for further proceedings and the attention called to this issue, we trust that the parties will have resolved any discovery problems with this potentially relevant evidence. We therefore reverse the trial court's exclusion of the evidence insofar as the DOC is now free to re-offer it, and the district court is now free to reexamine its admissibility.